1  BRUCE L. SIMON (Bar No. 96241)
      bsimon@pswlaw.com
2  BENJAMIN E. SHIFTAN (Bar No. 265767)
      bshiftan@pswlaw.com
3  **PEARSON, SIMON & WARSHAW, LLP**
   44 Montgomery Street, Suite 2450
4  San Francisco, California 94104
   Telephone: (415) 433-9000
5  Facsimile:  (415) 433-9008

6  CHRISTOPHER B. DOLAN (Bar No. 165358)
      chris@cbdlaw.com
7  **THE DOLAN LAW FIRM**
   1438 Market Street
8  San Francisco, California 94102
   Telephone: (415) 421-2800
9  Facsimile:  (415) 421-2830

10  Attorneys for Plaintiffs

11                **UNITED STATES DISTRICT COURT**

12       **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

13  | L.A. Taxi Cooperative, Inc. dba Yellow Cab | CASE NO. |

L.A. Taxi Cooperative, Inc. dba Yellow Cab Co.; Administrative Services SD, LLC dba Yellow Radio Service; All Yellow Taxi, Inc. dba Metro Cab; American Cab, LLC; American Cab, LLC dba Pomona Valley Yellow Cab; Bell Cab Company, Inc.; Big Dog City Corporation dba Citywide Dispatch, Citywide Taxi, and Big Dog Cab; Cabco Yellow, Inc. dba California Yellow Cab; C&J Leasing, Inc. dba Royal Taxi; G&S Transit Management, Inc.; Gorgee Enterprises, Inc.; LA City Cab, LLC; Long Beach Yellow Cab Co-operative, Inc.; Network Paratransit Systems, Inc.; South Bay Co-operative, Inc. dba United Checker Cab; Taxi Leasing, Inc. dba Yellow Cab of Ventura County; Tri-City Transportation Systems, Inc.; Tri Counties Transit Corporation dba Blue Dolphin Cab of Santa Barbara, Yellow Cab of Santa Maria, and Yellow Cab of San Luis Obispo; and Yellow Cab of South Bay Co-operative, Inc. dba South Bay Yellow Cab,

CASE NO.

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

                    Plaintiffs,

        vs.

Uber Technologies, Inc.; Rasier, LLC; and Rasier-CA, LLC.

                    Defendants.

862152.9

COMPLAINT

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

I.     INTRODUCTION ...................................................................................................1

II.    JURISDICTION AND VENUE ...........................................................................2

III.   INTRADISTRICT ASSIGNMENT ....................................................................3

IV.    PARTIES ................................................................................................................3

     A.     Plaintiffs ......................................................................................................3

     B.     Defendants ...................................................................................................5

V.     FACTUAL ALLEGATIONS ................................................................................6

     A.     Plaintiffs' Taxi Cabs Compete with Uber Cars for Customers ...................6

     B.     Uber Touts the Safety of Rides on Its Platform .........................................6

          1.     Uber's Representations Regarding Safety on Its Website ................6

          2.     Uber's Representations Regarding Safety In Connection with the "Safe Rides Fee" ................................................................................7

          3.     Uber's Representations Regarding the Superiority of Its Background Checks ...........................................................................9

          4.     Uber's Representations Regarding Safety in Interactions with the Media .............................................................................................10

     C.     The *Truth* – UberX Does Not Provide a Safer Platform than Plaintiffs' Taxi Cabs ...................................................................................................11

          1.     Plaintiffs' Drivers Must Undergo a More Rigorous Background Check than UberX Requires ...........................................................11

          2.     Unlike UberX Drivers, Plaintiffs' Drivers Receive Valuable Safety Training Before They Can Begin Transporting Passengers ........................14

          3.     Unlike UberX Drivers, Plaintiffs' Drivers Must Pass a Written Examination Before Transporting Passengers ...............................15

          4.     Uber Does Not Provide a Safer Platform than Plaintiffs Because Plaintiffs' Taxi Cabs Undergo More Stringent Vehicle Inspections and/or Satisfy More Stringent Maintenance Standards than UberX Vehicles .........................................................................................15

          5.     UberX Does Not Provide a Safer Platform than Plaintiffs Because Drivers for Each of the Taxi Cab Companies Are Prohibited from Driving for More than One Taxi Cab Company ...........................16

     D.     The District Attorneys in San Francisco and Los Angeles Have Sued Uber

i

COMPLAINT

for Some of the Same Advertising Misconduct Alleged in this Complaint............17

E.    Uber's False and Misleading Statements Cause Harm to Plaintiffs........................18

F.    Plaintiffs Have a Right to Seek Redress in Court, *not* in Arbitration .....................19

VI.   CLAIMS FOR RELIEF ........................................................................................19

VII.  PRAYER FOR RELIEF..........................................................................................24

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

ii

COMPLAINT

Plaintiffs L.A. Taxi Cooperative, Inc. dba Yellow Cab Co.; Administrative Services SD, LLC dba Yellow Radio Service; All Yellow Taxi, Inc. dba Metro Cab; American Cab, LLC; American Cab, LLC dba Pomona Valley Yellow Cab; Bell Cab Company, Inc.; Big Dog City Corporation dba Citywide Dispatch, Citywide Taxi, and Big Dog Cab; Cabco Yellow, Inc. dba California Yellow Cab; C&J Leasing, Inc. dba Royal Taxi; G&S Transit Management, Inc.; Gorgee Enterprises, Inc.; LA City Cab, LLC; Long Beach Yellow Cab Co-operative, Inc.; Network Paratransit Systems, Inc.; South Bay Co-operative, Inc. dba United Checker Cab; Taxi Leasing, Inc. dba Yellow Cab of Ventura County; Tri-City Transportation Systems, Inc.; Tri Counties Transit Corporation dba Blue Dolphin Cab of Santa Barbara, Yellow Cab of Santa Maria, and Yellow Cab of San Luis Obispo; and Yellow Cab of South Bay Co-operative, Inc. dba South Bay Yellow Cab (collectively, "Plaintiffs") bring this action against Defendants Uber Technologies, Inc.; Rasier, LLC; and Rasier-CA, LLC (collectively, "Uber").  Plaintiffs allege on the investigation of counsel and on information and belief as follows:

# I.   INTRODUCTION

1.    This case arises from Uber's unlawful advertising campaign, through which it causes significant harm to Plaintiffs.  As part of Uber's operation, Uber puts forth false and misleading advertisements regarding the safety of rides on Uber's "UberX" platform, and disparaging the safety of taxi rides offered by taxi cab companies.

2.    Although these false and misleading statements help Uber line its pockets, they also cause major financial harm to Plaintiffs in various ways.  For example, potential customers of Plaintiffs—who, due to Uber's misrepresentations, mistakenly believe that they will get a safer ride by hiring an UberX ride—spurn Plaintiffs' taxi cabs for UberX rides, resulting in lost revenue for Plaintiffs.  In addition, Uber's misrepresentations cause major reputational harm to Plaintiffs, as Uber's unlawful advertising causes consumers to doubt the safety of Plaintiffs' taxi cab rides, and to have, overall, a diminished view of Plaintiffs and their taxi cabs.

3.    The San Francisco City and County and Los Angeles County District Attorneys' Offices ("the District Attorneys") have recognized the unlawfulness of Uber's advertising tactics.  On December 9, 2014, the District Attorneys filed a complaint against Uber in San Francisco

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

Superior Court on behalf of the People of the State of California ("the District Attorneys' Lawsuit"), in which the District Attorneys focused, in large part, on Uber's deception pertaining to its background checks.  The District Attorneys' Lawsuit, which is fleshed out in more detail below, states, in part, as follows: "Uber's misrepresentations concerning the quality of its background check process are *untrue or misleading*." (emphasis in italics added).

4.     Plaintiffs provide taxi cab services in California.  Plaintiffs are and, at all times relevant to this action, were competitors of Uber.  Plaintiffs' taxi cabs vie for the same customers as Uber cars, and—as a result—compete for the same dollars.

5.     Uber, a transportation network company, uses a smart phone application ("app") to connect passengers looking for rides with drivers looking to provide rides.  Using the app, customers can request rides from drivers, pay for rides, and do other things.  Uber advertises its ridesharing service in a variety of different places – on the internet, via e-mail, and elsewhere.

## II.     JURISDICTION AND VENUE

6.     Plaintiffs bring this action to obtain injunctive relief, damages, Uber's profits, restitution, restitutionary disgorgement, and reasonable attorneys' fees and costs, arising from Uber's violations of the Lanham Act (15 U.S.C. § 1125), California's False Advertising Law (California Business and Professions Code, § 17500), and California's Unfair Competition Law (California Business and Professions Code, § 17200).

7.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121 (Lanham Act claims) and 28 U.S.C. § 1331 (federal question claims).  This Court also has supplemental subject matter jurisdiction with respect to the state law claims pursuant to 28 U.S.C. § 1367.

8.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Uber resides in this District and a significant number of the events and omissions giving rise to these claims occurred in this District.

9.     Uber is subject to the personal jurisdiction of this Court by virtue of its contacts with the State of California.

2

COMPLAINT

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1    III.    **INTRADISTRICT ASSIGNMENT**

2        10.    Pursuant to Local Rule 3-5, this action should be assigned to the San Francisco

3    Division of this District, as this action arises in San Francisco County – the location of Uber's

4    headquarters.

5    IV.    **PARTIES**

6        A.    **Plaintiffs**

7        11.    Plaintiff L.A. Taxi Cooperative, Inc., a California corporation, dba Yellow Cab Co.

8    maintains headquarters in Gardena, CA.  Plaintiff L.A. Taxi Cooperative, Inc. dba Yellow Cab Co.

9    offers taxi cab services and has approximately 812 taxi cabs in its fleet.

10        12.    Plaintiff Administrative Services SD, LLC, a California limited liability company,

11    dba Yellow Radio Service maintains headquarters in San Diego, CA.  Plaintiff Administrative

12    Services SD, LLC dba Yellow Radio Service offers taxi cab services and has approximately 289

13    taxi cabs in its fleet.

14        13.    Plaintiff All Yellow Taxi, Inc., a California corporation, dba Metro Cab maintains

15    headquarters in Gardena, CA.  Plaintiff All Yellow Taxi, Inc. dba Metro Cab offers taxi cab

16    services and has approximately 170 taxi cabs in its fleet.

17        14.    Plaintiff American Cab, LLC, a California limited liability company, maintains

18    headquarters in Thousand Palms, CA.  Plaintiff American Cab, LLC offers taxi cab services and

19    has approximately 70 taxi cabs in its fleet.

20        15.    Plaintiff American Cab, LLC, a California limited liability company, dba Pomona

21    Valley Yellow Cab maintains headquarters in Thousand Palms, CA.  Plaintiff American Cab, LLC

22    dba Pomona Valley Yellow Cab offers taxi cab services and has approximately 130 taxi cabs in its

23    fleet.

24        16.    Plaintiff Bell Cab Company, Inc., a California corporation, maintains headquarters

25    in Hawthorne, CA.  Plaintiff Bell Cab Company, Inc. offers taxi cab services and has

26    approximately 305 taxi cabs in its fleet.

27        17.    Plaintiff Big Dog City Corporation, a California corporation, dba Citywide

28    Dispatch, Citywide Taxi, and Big Dog Cab maintains headquarters in San Francisco, CA.

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1  Plaintiff Big Dog City Corporation dba Citywide Dispatch, Citywide Taxi, and Big Dog Cab

2  offers taxi cab services and has approximately 53 taxi cabs in its fleet.

3       18.    Plaintiff Cabco Yellow, Inc., a California corporation, dba California Yellow Cab

4  maintains headquarters in Santa Ana, CA. Plaintiff Cabco Yellow, Inc. dba California Yellow

5  Cab offers taxi cab services and has approximately 220 taxi cabs in its fleet.

6       19.    Plaintiff C&J Leasing, Inc., a California corporation, dba Royal Taxi maintains

7  headquarters in San Francisco, CA. Plaintiff C&J Leasing, Inc. dba Royal Taxi offers taxi cab

8  services and has approximately 70 taxi cabs in its fleet.

9       20.    Plaintiff G&S Transit Management, Inc., a California corporation, maintains

10  headquarters in Sun Valley, CA. Plaintiff G&S Transit Management, Inc. offers taxi cab services

11  and has approximately 85 taxi cabs in its fleet.

12       21.    Plaintiff Gorgee Enterprises, Inc., a California corporation, maintains headquarters

13  in Pasadena, CA. Plaintiff Gorgee Enterprises, Inc. offers taxi cab services and has approximately

14  30 taxi cabs in its fleet.

15       22.    Plaintiff LA City Cab, LLC, a California limited liability company, maintains

16  headquarters in Sun Valley, CA. Plaintiff LA City Cab, LLC offers taxi cab services and has

17  approximately 170 taxi cabs in its fleet.

18       23.    Plaintiff Long Beach Yellow Cab Co-operative, Inc., a California corporation,

19  maintains headquarters in Gardena, CA. Plaintiff Long Beach Yellow Cab Co-operative, Inc.

20  offers taxi cab services and has approximately 171 taxi cabs in its fleet.

21       24.    Plaintiff Network Paratransit Systems, Inc., a California corporation, maintains

22  headquarters in San Bernardino, CA. Plaintiff Network Paratransit Systems, Inc. offers taxi cab

23  services and has approximately 85 taxi cabs in its fleet.

24       25.    Plaintiff South Bay Co-operative, Inc., a California corporation, dba United

25  Checker Cab maintains headquarters in Gardena, CA. Plaintiff South Bay Co-operative, Inc. dba

26  United Checker Cab offers taxi cab services and has approximately 75 taxi cabs in its fleet.

27       26.    Plaintiff Taxi Leasing, Inc., a California corporation, dba Yellow Cab of Ventura

28  County maintains headquarters in Camarillo, CA. Plaintiff Taxi Leasing, Inc. dba Yellow Cab of

1    Ventura County offers taxi cab services and has approximately 45 taxi cabs in its fleet.

2        27.    Plaintiff Tri-City Transportation Systems, Inc., a California corporation, maintains

3    headquarters in Sun Valley, CA.  Plaintiff Tri-City Transportation Systems, Inc. offers taxi cab

4    services and has approximately 195 taxi cabs in its fleet.

5        28.    Plaintiff Tri Counties Transit Corporation, a California corporation, dba Blue

6    Dolphin Cab of Santa Barbara, Yellow Cab of Santa Maria, and Yellow Cab of San Luis Obispo

7    maintains headquarters in Camarillo, CA. Plaintiff Tri Counties Transit Corporation dba Blue

8    Dolphin Cab of Santa Barbara, Yellow Cab of Santa Maria, and Yellow Cab of San Luis Obispo

9    offers taxi cab services and has approximately 40 taxi cabs in its fleet.

10       29.    Plaintiff Yellow Cab of South Bay Co-operative, Inc., a California corporation, dba

11   South Bay Yellow Cab maintains headquarters in Gardena, CA.  Plaintiff Yellow Cab of South

12   Bay Co-operative, Inc. dba South Bay Yellow Cab offers taxi cab services and has approximately

13   119 taxi cabs in its fleet.

14       **B.    <u>Defendants</u>**

15       30.    Defendant Uber Technologies, Inc., a Delaware corporation, maintains

16   headquarters in San Francisco, California.

17       31.    Defendant Rasier, LLC, a Delaware limited liability company, maintains

18   headquarters in San Francisco, California.  Defendant Rasier, LLC is a subsidiary of Defendant

19   Uber Technologies, Inc., and licenses mobile application technology from Defendant Uber

20   Technologies, Inc.

21       32.    Defendant Rasier-CA, LLC, a Delaware limited liability company, maintains

22   headquarters in San Francisco, California.  Defendant Rasier-CA, LLC is a subsidiary of

23   Defendant Uber Technologies, Inc. and holds a Transportation Network Company Permit from the

24   California Public Utilities Commission.

25       33.    Uber, which considers itself to be a ridesharing service, uses a smartphone app to

26   connect its users with Uber drivers.

27

28

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

862152.9

COMPLAINT

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

## V.     <u>FACTUAL ALLEGATIONS</u>

### A.     **Plaintiffs' Taxi Cabs Compete with Uber Cars for Customers**

34.     Plaintiffs collectively offer convenient, reliable, and safe taxi services in counties throughout California, including, but not limited to, San Francisco County, Los Angeles County, and San Diego County.

35.     Uber offers consumers a smartphone app that, when downloaded, connects customers looking for transportation with Uber cars.

36.     Uber operates in the same cities and counties as Plaintiffs.

37.     Accordingly, Plaintiffs are Uber's competitors. Plaintiffs and Uber vie for the same dollars from the same set of consumers.

38.     As explained in detail below, Uber has engaged in unfair competition against Plaintiffs, including by way of its false advertisements, and has thereby injured Plaintiffs.

39.     This case is brought on behalf of Plaintiffs in order to obtain redress for the unlawful actions taken by Uber.

### B.     **Uber Touts the Safety of Rides on Its Platform**

#### 1.     **Uber's Representations Regarding Safety on Its Website**

40.     Uber has offered and continues to offer numerous representations regarding the safety of rides on the Uber platform.

41.     Uber's website consistently emphasizes that Uber offers the safest rides possible.

42.     For example, Uber's website proclaims in large capital letters that it has the "SAFEST RIDES ON THE ROAD," and it boasts that Uber is "GOING THE DISTANCE TO PUT PEOPLE FIRST."

43.     The website further states: "Wherever you are around the world, Uber is committed to connecting you to the safest ride on the road. That means setting the strictest safety standards possible, then working hard to improve them every day."

44.     Similarly, Uber's blog (which can be accessed easily from Uber's website) trumpets the safety of Uber rides. There, Uber's Head of Communications – North America, Lane Kasselman, states in part:

**The bottom line**

Uber works hard to ensure that we are connecting riders with the safest rides on the road. The current efforts we are undertaking to protect riders, drivers and cities are just the beginning.

We'll continue innovating, refining, and working diligently to ensure we're doing everything we can to make Uber the safest experience on the road.

45.     After an UberX driver struck and killed a six-year old girl on December 31, 2013, Uber issued a "STATEMENT ON NEW YEAR'S EVE ACCIDENT" on its blog, stating, in part, "We are committed to improving *the __already__ best in class safety* and accountability of the Uber platform, for both riders and drivers." (emphasis in italics and underlining added).

46.     Uber uses its website to try to convince customers that Uber offers safer rides than taxi cabs.  For example, on the Uber website, Uber emphasizes that it provides "**SAFE PICKUPS**," telling customers, "No more waiting alone on a dark street hoping you can hail a taxi."

**2.     Uber's Representations Regarding Safety In Connection with the "Safe Rides Fee"**

47.     Uber makes further representations regarding the superior safety provided on the Uber platform in connection with information Uber provides customers regarding its "Safe Rides Fee" – the $1 fee that is charged to every United States rider after using the UberX service, no matter the duration or distance of the ride.

48.     Whenever a United States Uber customer uses UberX, they, at the completion of their ride, receive an automatically generated e-mail from Uber that contains their bill for their transportation.  This bill includes a fare breakdown (including calculations for, amongst other components of the bill, "Base Fare" and "Distance").  The bill also includes a $1.00 fee labeled as the "Safe Rides Fee."

49.     Customers see a small, hyperlinked question mark (?) next to the word "Safe Rides Fee," inviting customers to click on the link to learn about the justification for the extra $1.00 "Safe Rides Fee" that customers are being charged to travel via UberX.

50.     When customers click on this hyperlink, they are directed to an Uber-operated

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1    internet site, which provides the purported explanation for the "Safe Rides Fee."  That website

2    states, in part, as follows:

3        **What Is The Safe Rides Fee?**

4            From the beginning, we've always been committed to connecting you with
             the safest rides on the road. The Safe Rides Fee is a fee added to uberX
5            fares on behalf of drivers (who may pay this fee to Uber) in cities with
             uberX ridesharing. This Safe Rides Fee supports continued efforts to
6            ensure the safest possible platform for Uber riders and drivers . . . . For
             complete pricing transparency, you'll see this as a separate line item on
7            every uberX receipt.

8            In the U.S., the Safe Rides Fee is always $1 USD. In Canada, it is $1
9            CAD.

10       51.    These statements actually deceive, or have the tendency to deceive, customers into

11   believing that riders who pay this $1 per ride fee to use UberX are being transported on the "safest

12   possible platform."

13       52.    Similarly, these statements actually deceive, or have the tendency to deceive,

14   customers into believing that riders who pay this $1 per ride fee to use UberX are safer than if they

15   chose transportation via a taxi cab.  Because this "Safe Rides Fee" is a separate line item on the

16   receipt that Uber issues to customers, this bolsters the consumers' expectation that they should be

17   receiving the safest ride possible.  Put differently, considering that Uber explicitly specifies that

18   this is an *additional* safety fee, it is reasonable for consumers to expect that they will be receiving

19   a ride safer than that provided by Plaintiffs' taxi cabs, as Plaintiffs' taxicabs simply charge a total

20   fare, without imposing any additional surcharge to ensure a "Safe Ride."

21       53.    The statements also explicitly represent to consumers that the entirety of each $1

22   "Safe Rides Fee" earned by Uber goes towards ensuring the safety of Uber riders and drivers, as

23   opposed to towards Uber's bottom line or some other aspect of the company.

24       54.    On information and belief, the entirety of each $1 "Safe Rides Fee" earned by Uber

25   does not go towards ensuring the "safest rides on the road."  Data from as far back as 2013—when

26   Uber was not as prevalent as it is today—shows that Uber was completing approximately 800,000

27   trips a week – or over *41 million* trips per year.  Now, in 2015, Uber and UberX are more

28   financially successful than ever.  Accordingly, it is clear that Uber is making an enormous sum of

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1  money from the "Safe Rides Fee" that it tacks on to *every single* UberX ride it provides.  Given

2  the comparatively inadequate safety measures that Uber has in place (as explained in detail

3  below), Uber is not, on information and belief, spending the entirety of the millions upon millions

4  of dollars that it receives in "Safe Rides Fees" on safety measures.

5           **3.    Uber's Representations Regarding the Superiority of Its
                    Background Checks**

6

7           55.    As a large part of Uber's advertising campaign trumpeting its safety standards,

8  Uber consistently (1) boasts about the purportedly rigorous background checks to which Uber

9  drivers are subject, and (2) emphasizes the purportedly inferior background checks to which taxi

10 cab drivers are subject.

11          56.    Uber's website proclaims that Uber offers "**BACKGROUND CHECKS YOU**

12 **CAN TRUST**."  The website further states, "Every ridesharing and livery driver is thoroughly

13 screened through a rigorous process we've developed using constantly improving standards . . . ."

14          57.    Until at least October 29, 2014, Uber's website boasted *even more emphatically*

15 about its background checks, as the website stated, "Every ridesharing and livery driver is

16 thoroughly screened through a rigorous process we've developed using *industry-leading*

17 standards." (emphasis in italics added).

18          58.    Uber's blog currently elaborates on Uber's background check procedure.  There,

19 Uber's Head of Communications – North America, Lane Kasselman, states:

20      All Uber ridesharing and livery partners must go through a rigorous background
        check. The three-step screening we've developed across the United States, which
21      includes county, federal and multi-state checks, *has set a new standard*. . . . We
        apply this *comprehensive and new industry standard* consistently across all Uber
22      products, including uberX.

23      Screening for safe drivers is just the beginning of our safety efforts. Our process
24      includes prospective and regular checks of drivers' motor vehicle records to
        ensure ongoing safe driving. *Unlike the taxi industry, our background checking*
25      *process and standards are consistent across the United States and often more*
        *rigorous than what is required to become a taxi driver.* (emphasis in italics
26      added).

27

28          59.    Until at least December 10, 2014, this blog post stated, in part, even more

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1  emphatically that "[a]ll Uber ridesharing and livery partners must go through a rigorous

2  background check *that leads the industry.*" (emphasis in italics added).

3      60.    Similarly, on the website purportedly justifying the $1 "Safe Rides Fee" discussed

4  above, Uber, until October 2014, represented, in part, that "[t]his Safe Rides Fee supports our

5  continued efforts to ensure the safest possible platform for Uber riders and drivers, including an

6  industry-leading background check process."

7      61.    The website has since dropped the "industry-leading" language but still trumpets,

8  in part: "This Safe Rides Fee supports continued efforts to ensure the safest possible platform for

9  Uber riders and drivers . . . . "[1]

10      **4.    Uber's Representations Regarding Safety in Interactions with the Media**

11

12      62.    Uber has boasted to the media about the safety of Uber rides.

13      63.    For example, Uber's Senior Communications Associate, Central North America,

14  Lauren Altmin, issued a statement to NBC's Detroit affiliate which stated, in part, as follows:

15      What I can tell you is that Uber takes passenger safety very seriously. We

16      work every day to connect riders with the *safest rides on the road* and go above and beyond local requirements in every city we operate.

17      Uber only partners with drivers who pass an *industry-leading screening*

18      that includes a criminal background check at the county, federal and multi-

19      state level going back as far as the law allows. We also conduct ongoing reviews of drivers' motor vehicle records during their time as an Uber

20      partner.

21      . . . .

22      For more information on what makes Uber *the safest rides on the road*,

23      please see our website . . . . (emphasis in italics added).

24      64.    Similarly, an April 29, 2014 article entitled "Faulty Background Checks May Put

25

26  [1] The fact that Uber, as explained at various points throughout the Complaint, has downgraded the

27  representations on its website about safety demonstrates that Uber itself realizes that those representations to the public were false and misleading at the time they were made.

28

PEARSON, SIMON & WARSHAW, LLP 44 MONTGOMERY STREET, SUITE 2450 SAN FRANCISCO, CALIFORNIA 94104

1  UberX Passengers at Risk, Report Says" quotes Uber's Head of Communications – North

2  America, Lane Kasselman, as stating:

3       Uber's industry-leading background checks help connect consumers with the
        safest ride on the road . . . . Our driver partner background checks are more

4       thorough than those of taxi [sic] in most cities . . . . We continue to improve and
        are always working hard to tighten our policies and processes to ensure that Uber

5       remains the safest transportation option available.

6

7       65.     Similarly, in a June 25, 2014 NBCBayArea.com news report, Uber's Head of

8  Communications – North America, Lane Kasselman, is quoted as saying, "We're confident that

9  every ride on the Uber platform is safer than a taxi."

10      **C.     The _Truth_ – UberX Does Not Provide a Safer Platform than Plaintiffs'
                 Taxi Cabs**

11

12      66.     Uber's representations about the safety of its rides are false and misleading.

13      67.     Plaintiffs offer a safer transportation experience than UberX in a variety of different

14  ways, including, but not limited to, the following.

15      **1.      Plaintiffs' Drivers Must Undergo a More Rigorous
                   Background Check than UberX Requires**

16

17      68.     Uber's claims that it offers industry-leading background investigations and the

18  "safest rides on the road" (as well as claims similar to that) were and/or are false and misleading,

19  as taxi cab drivers driving Plaintiffs' taxi cabs are subjected to more significant scrutiny.

20      69.     Taxi cab drivers who drive in Plaintiffs' taxi cabs must submit to "Live Scan"

21  before they can begin transporting passengers.

22      70.     Live Scan is considered the gold standard of background checks for a variety of

23  reasons.  Live Scan, which uses fingerprint identification, analyzes the information in Department

24  of Justice and FBI systems that have no time-based or jurisdictional limitations.  In addition, Live

25  Scan continuously refreshes the results of a person's background check, signifying that taxi cab

26  drivers who commit crimes after being initially cleared will still be caught by this system.

27      71.     The use of fingerprinting is a critical aspect of Live Scan, as this fingerprinting

28  ensures that the person whose criminal history is analyzed is, in fact, the applicant seeking to

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1   become a taxi driver.

2       72.     According to one article, Live Scan is "the most complete and thorough database

3   available, which is why taxi companies are required to Live Scan check their drivers, not just

4   search public records systems."

5       73.     Uber, to the contrary, does not require that its UberX drivers submit to Live Scan

6   testing.

7       74.     Rather, Uber's background checks are run by a private third-party company called

8   Hirease.  The background check process employed by Hirease has both jurisdictional and time-

9   based limits, as it screens drivers against (1) county courthouse records going back 7 years for

10  every county of residence, (2) federal courthouse records going back 7 years, and (3) the multi-

11  state criminal database going back 7 years.

12      75.     In addition, Uber's background check process does not automatically update its

13  results.  Rather, UberX drivers are required to submit to a background check only once.  Thus,

14  after an UberX driver passes his/her background check, there would be no official notice to Uber

15  if the driver ever committed a crime. All Uber does after an initial partnership is to conduct

16  ongoing reviews of *motor vehicle* records – *not* all criminal records.  Thus, even if an UberX

17  driver committed a violent crime a week after he/she started driving for Uber, Uber would not

18  automatically be notified of this news.

19      76.     Uber's failure to require fingerprinting of its prospective drivers renders its

20  background checks inferior to those that utilize Live Scan technology (such as those that the

21  drivers in Plaintiffs' taxi cabs must undergo).  Even Hirease, the company that carries out Uber's

22  background checks, acknowledges this, as it states on its website, "Fingerprinting helps uncover

23  criminal history not discovered through traditional methods, offers extra protection to aid in

24  meeting industry guidelines, and helps prevent fraud."

25      77.     Numerous articles have highlighted the fundamental differences between the types

26  of background checks that Uber uses and those Live Scan background checks that Plaintiffs' taxi

27  cab drivers must undergo. For example, one article stated:

28          The problem with Uber "fixing" its background checks is that its third-party

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

background checks will never equal the quality of publicly regulated, law enforcement implemented background checks. Their checks do not report information from all US Courts and only provide convictions in most cases for a fixed number of years, seven to ten. Typically, taxicab companies are required to use "Live Scan," a fingerprint-based background check of drivers filtered through the Department of Justice and FBI systems that have no time based or jurisdictional limitations. *Most importantly, Live Scan automatically updates its results, meaning that drivers who commit crimes after being initially cleared are caught by this system.* (emphasis in italics added).

78.     Another article highlighted this final point, explaining why Live Scan's "automatic update" feature makes it clearly superior to the cheaper background checks used by Uber: "In addition to combing official databases, the Live Scan also updates after the fact. If a driver gets arrested for raping someone after being hired, the company will be notified. In contrast, other background checks are a static picture in time."

79.     Similarly, yet another article emphasizes how Live Scan background checks are superior to those used by Uber:

> When Uber says *"we background check drivers"* you'd think that means something really official, perhaps vetted by the Department of Justice and accessing government crime databases, right? You'd be wrong. . . . Background checks in the U.S. are a fragmented, broken system, with different records scattered across states and counties, much of which aren't digitized. And there's no fail-proof way to make sure you've searched them all.
>
> *The closest a background check can get to legitimate is the Live Scan system, which uses fingerprints and accesses government records.* It's the type of background check required for many sensitive job positions, like school teachers, medical personnel, and (in much of California) taxi drivers. But Live Scans are expensive — $100 a pop — and inconvenient for tech companies trying to scale quickly. If Uber had to send someone for a fingerprint every time it wanted to onboard a new driver, it probably wouldn't have moved into as many new markets as quickly as it did.
>
> *The cheaper, faster option is to use applicant social security numbers to run checks through private companies like Hirease and Sterling, which access mishmashes of databases.* They scan PACER for federal records, tap state DMVs for driving records, and employ runners to pick up physical records at county court houses where records aren't digitized. *There's a lot of flaws with this system*, but it's a hell of a lot cheaper than Live Scan and it's almost universally adopted by startups employing "background checked" contract workers. (emphasis in italics added).

80.     Given the plain superiority of the Live Scan background checks that Plaintiffs' taxi

COMPLAINT

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1   cab drivers must pass, it is and/or was false and misleading for Uber to trumpet that it offers the

2   best background checks possible, including, but not limited to, by asserting that it offers the

3   "SAFEST RIDES ON THE ROAD," and that "[a]ll Uber ridesharing . . . partners must go through

4   a rigorous background check that leads the industry."

5         81.    Because it is clear that Uber is not employing the most effective background checks

6   available, it is not surprising that one Uber driver—who used to drive a taxi cab—is quoted in an

7   article as stating: "Uber's claim that their screening process is 'often more rigorous' than what it

8   takes to become a taxi driver *is an outright lie*." (emphasis in italics added).

9         **2.     Unlike UberX Drivers, Plaintiffs' Drivers Receive Valuable**
                **Safety Training Before They Can Begin Transporting**
10               **Passengers**

11        82.    Uber's claims that it offers the "safest rides on the road" (as well as claims similar

12  to that) are false and misleading, as nearly all of the taxi cab drivers driving in Plaintiffs' taxi cabs,

13  unlike UberX drivers, are required to take a driver safety training course and/or receive other

14  valuable safety training before they can begin transporting passengers.

15        83.    This driver safety training course and/or other valuable safety training can include,

16  but is not limited to, a primer on the rules of the road, "drive-alongs" with another driver or an

17  employee at the taxi cab company, defensive driving instruction, training on how to use a dispatch

18  system, training on how to transport disabled passengers, customer service training, sensitivity

19  training, providing drivers with a helpful "Driver Reference Guide," and/or training on how to

20  navigate a city.  This training is important, as it helps the effort to ensure that the taxi cab drivers

21  are capable of safely transporting passengers once they begin driving in Plaintiffs' taxi cabs.

22        84.    Uber does not require that its UberX drivers take a driver safety training course, nor

23  does it provide any other substantive safety training.  In fact, Forbes.com has reported that if

24  drivers want to take a driver training course—which provides "the basics of how to be a courteous

25  and safe driver"—then they may *voluntarily* do so on their own time.

26        85.    This lack of training is reflected in the fact that many UberX drivers do not know

27  how to get to even the most major intersections in cities in which they are operating, rely almost

28  exclusively on GPS technology, routinely have gruff exchanges with passengers, and/or drive in

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1    an otherwise unsafe manner.

2          **3.      Unlike UberX Drivers, Plaintiffs' Drivers Must Pass a Written
                      Examination Before Transporting Passengers**
3

4          86.    Uber's claims that it offers the "safest rides on the road" (as well as claims similar

5    to that) are false and misleading, as most of the taxi cab drivers driving Plaintiffs' taxi cabs, unlike

6    UberX drivers, are required to pass a written examination before they can begin driving customers.

7          87.    These examinations can test a variety of different important subjects, including, but

8    not limited to, city code issues, safety, the laws of the road, the shortest routes between points, taxi

9    regulations, how to appropriately interact with customers, English proficiency, navigational skills,

10   identification of major landmarks, familiarity with geography, and/or other key topics relevant to

11   safely transporting passengers.

12         88.    Uber does not require that its UberX drivers pass any written examination.  To the

13   contrary, as a Huffington Post writer who went undercover as an Uber driver discovered,

14   "[b]ecoming an Uber driver is actually a piece of cake. They'll pretty much take anyone, as is

15   demonstrated by the downloadable video test you have to pass, which is about as hard to master as

16   tying your shoes."

17         89.    In fact, the ease with which non-professional drivers can become Uber drivers has

18   become, literally, a joke – as comedian Jimmy Kimmel even went undercover as an Uber driver

19   for an afternoon in Los Angeles.

20         **4.      Uber Does Not Provide a Safer Platform than Plaintiffs
                      Because Plaintiffs' Taxi Cabs Undergo More Stringent Vehicle
21                    Inspections and/or Satisfy More Stringent Maintenance
                      Standards than UberX Vehicles**
22

23         90.    Uber's claims that it offers the "safest rides on the road" (as well as claims similar

24   to that) are false and misleading, as Uber does not require that all vehicles on the UberX platform

25   pass a safety inspection or satisfy maintenance standards that are as stringent as those required for

26   Plaintiffs' vehicles.

27         91.    Uber's purported safety inspections and vehicle maintenance standards are a far cry

28   from those mandated for Plaintiffs' taxi cabs.  On information and belief, Uber simply requires a

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1  19-point vehicle inspection, and asks the potential driver to *take a picture* of the vehicle inspection

2  form and receipt and e-mail it to Uber.

3       92.    Although Plaintiffs' taxi cabs' inspections and maintenance standards vary, they

4  are, for various reasons, superior to those required by Uber.  For example, the taxi cabs belonging

5  to one of the Plaintiffs are put up on a lift and raised, enabling an inspection of *every* possible

6  aspect of the car, in order to ensure that the taxi cabs are fit for service.  Similarly, another

7  Plaintiff's taxi cabs are subjected to *75-point* vehicle inspections – a large leap from Uber's 19-

8  point vehicle inspections.  Furthermore, the fleet of taxi cabs of at least one of the Plaintiffs is

9  inspected by the police department itself.

10       93.    The other Plaintiffs' vehicle inspection and maintenance processes, although

11  different from company to company, have one thing in common – they each are more stringent

12  than UberX's requirements.

13       **5.**    **UberX Does Not Provide a Safer Platform than Plaintiffs**
**Because Drivers for Each of the Taxi Cab Companies Are**
14      **Prohibited from Driving for More than One Taxi Cab**
**Company**
15

16       94.    Uber's claims that it offers the "safest rides on the road" (as well as claims similar

17  to that) are false and misleading, as taxi cab drivers driving for Plaintiffs are prohibited from using

18  dispatch services provided by other taxi cab companies.

19       95.    This is important, as it helps to ensure that Plaintiffs' taxi cab drivers will focus

20  their attention on driving, and not become preoccupied by toggling between various dispatch

21  services.

22       96.    Uber does not insist that Uber drivers drive exclusively for Uber.  In fact, it is

23  commonplace for UberX drivers to drive for both Uber and a ridesharing competitor such as Lyft,

24  Inc. ("Lyft").

25       97.    The result of Uber's failure to prohibit this practice is that these drivers often have

26  two cell phones open while transporting a passenger—with one cell phone running the Uber app

27  and one cell phone running, for example, the Lyft app.  Thus, even when an UberX driver is

28  transporting a passenger, he/she can be distracted by his/her cell phone, as it may be alerting the

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1   driver that a potential Lyft passenger is seeking a ride.  This can be a distraction for UberX

2   drivers, as these drivers can be induced to take their eyes off of the road, thereby jeopardizing their

3   passengers' safety (as well as their own safety, the safety of drivers and passengers in other cars

4   on the road, and pedestrians on sidewalks and in crosswalks).

5        **D.**     **The District Attorneys in San Francisco and Los Angeles Have Sued**

6                 **Uber for Some of the Same Advertising Misconduct Alleged in this Complaint**

7         98.     On December 9, 2014, the San Francisco City and County and Los Angeles County

8   District Attorneys' Offices filed suit on behalf of the People of the State of California against

9   Uber.  The case is styled *The People of the State of California v. Uber Technologies, Inc.*, San

10  Francisco Superior Court Case No. CGC 14-543120.  The District Attorneys allege two causes of

11  action against Uber: (1) a violation of California Business and Professions Code, § 17500

12  (California's False Advertising Law); and (2) a violation of California Business and Professions

13  Code, § 17200 (California's Unfair Competition Law).  A true and correct copy of the District

14  Attorneys' Lawsuit is attached hereto as **Exhibit A**.

15        99.     The District Attorneys' Lawsuit focuses on the same (or similar) false and

16  misleading representations about background checks discussed herein.  For example, the District

17  Attorneys' Lawsuit emphasizes that Uber misleads customers by stating that it has an "industry-

18  leading" background check which it claims to be "often more rigorous than what is required to

19  become a taxi driver."  The District Attorneys' Lawsuit states, in part, as follows:

20       The representations made by Uber set forth in the foregoing paragraphs are untrue
    or misleading in violation of California law. Viewed separately or together, the

21       representations are likely to mislead consumers into believing that Uber does
    everything it can to ensure their safety when, in fact, the centerpiece of Uber's

22       customer safety assurances – the background check process Uber describes as

23       "industry-leading" and touts as "often more rigorous than what is required to
    become a taxi driver" – does not use fingerprint identification and therefore

24       cannot ensure the information Uber obtains from a background check actually
    pertains to the applicant.

25

26        100.    Furthermore, the District Attorneys' Lawsuit continues, in part, as follows:

27       Uber's representations concerning the quality of its background check process are
    untrue or misleading. Contrary to Uber's multiple representations that it employs

28       "background checks you can trust," that it uses a background check process that

"leads the industry," and that its background check process is "often more rigorous than what is required to become a taxi driver" Uber's background check process does not provide the level of security provided by the fingerprint-based Live Scan/DOJ Process employed for performing background checks on taxi drivers in California's most populous cities.

101.    In announcing the filing of the District Attorneys' Lawsuit, the two District Attorneys' Offices[2] stated as follows: "Uber has refused to comply with straightforward California laws that protect consumers from fraud and harm."

**E.    Uber's False and Misleading Statements Cause Harm to Plaintiffs**

102.    Uber's false and misleading advertisements cause major harm to Plaintiffs. Uber's advertising campaign actually deceives, or has a tendency to deceive, customers looking for rides. Specifically, Uber's false and misleading advertisements convince customers that UberX offers a safer ride than Plaintiffs' taxi cabs. Accordingly, as a result of these representations, customers opt for taking UberX rides instead of taxi cab rides with Plaintiffs.

103.    This causes Plaintiffs to lose significant amounts of revenue, including, but not limited to, through a decrease in the amount of leasing revenue they can receive for their taxi cabs, a decreased number of calls into dispatch, a reduced fleet of drivers, a reduced number of taxi cabs in service, a reduced number of shifts worked by drivers, and/or a devaluing of share prices.

104.    In addition, these false and misleading advertisements leave customers with a lessened view of Plaintiffs, their taxi cabs, and the taxi cab drivers, thus causing reputational injury to Plaintiffs.

105.    Uber's false and misleading advertisements have caused customers to trust Plaintiffs (and the drivers of their taxi cabs) less, and to take their valuable business elsewhere.

106.    The false and misleading advertisements have also caused lost profits.

---

[2] At a news conference on the day the complaint was filed, San Francisco City and County District Attorney George Gascon referred to Uber's background checks as "completely worthless," and noted that Uber was "giving consumers a false sense of security when deciding whether to get into a stranger's car." The same day, at a separate news conference, Los Angeles County District Attorney Jackie Lacey said, "It's not our goal to shut them down. What we're saying is the advertising is false."

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

F. **Plaintiffs Have a Right to Seek Redress in Court, *not* in Arbitration**

107. Plaintiffs have never signed a contract with Uber containing any sort of arbitration provision that would govern these claims.

108. Any agreement between Uber and customers that contains an alleged arbitration provision does not apply to Plaintiffs, as Plaintiffs have never exploited such an agreement.

109. To the contrary, as alleged herein, Plaintiffs have been financially harmed by Uber unfairly competing with Plaintiffs to provide transportation services to customers.

VI. **CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**VIOLATION OF THE LANHAM ACT (15 U.S.C. § 1125(a))**

**(Against All Defendants)**

110. Plaintiffs incorporate by reference all of the above allegations as if fully set forth herein.

111. Plaintiffs vie for the same customers as Uber, and—as a result—compete for the same dollars. Accordingly, Plaintiffs have standing to bring this Lanham Act claim against Uber.

112. Uber has made false and misleading statements in commercial advertising concerning the safety of riding in an UberX vehicle. In addition, Uber has made false and misleading statements in commercial advertising concerning the safety of riding in a taxi cab.

113. These statements misrepresent the nature, characteristics, and qualities of the service provided by UberX and taxi cab companies like Plaintiffs.

114. These statements by Uber actually deceive, or have the tendency to deceive, a substantial segment of their audience.

115. On information and belief, Plaintiffs allege that—given Uber's financial resources, sophisticated personnel, and knowledge of the taxi cab industry—Uber deliberately published these representations in an effort to deceive customers and influence these customers' purchasing decisions.

116. The deception is material, as it is likely to influence the purchasing decisions of consumers who seek transportation in the form of a taxi cab operated by one of the Plaintiffs or an

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1  UberX ride.

2  117.   Uber causes its false and misleading statements to enter interstate commerce by

3  way of advertising to and otherwise communicating with potential customers located in multiple

4  states, including, but not limited to, by publishing its advertisements on the internet.

5  118.   Plaintiffs have been and are likely to continue to be injured as a result of the false

6  and misleading statements in the form of declining revenue, lost profits, lost drivers, decreased

7  value of shares, reduced number of taxi cabs in service, reduced number of shifts worked by

8  drivers, a devaluing of share prices, and/or other injuries.

9  119.   The false and misleading statements inflict significant reputational harm on

10  Plaintiffs, as, for example, customers do not believe Plaintiffs offer as safe an experience as does

11  UberX.  For example, as a result of Uber's practices, customers do not believe that the drivers of

12  Plaintiffs' taxi cabs have passed a rigorous background check, and customers do not feel safe

13  traveling in one of Plaintiffs' taxi cabs.

14  120.   These injuries have been caused, in whole or in part, by Uber's advertising

15  discussed herein.

16  121.   Uber's actions constitute a violation of the Lanham Act. Under the statute,

17  Plaintiffs are entitled to up to three times the damages sustained by Plaintiffs, as well as Uber's

18  profits.   Plaintiffs are also entitled to preliminary and permanent injunctive relief because, without

19  injunctive relief, Plaintiffs (1) will suffer irreparable harm because of Uber's false and misleading

20  advertising, and (2) lack an adequate remedy at law to stop these Lanham Act violations.  Further,

21  given the exceptional circumstances of this case, Plaintiffs are entitled to reasonable attorneys'

22  fees.  Plaintiffs are also entitled to recover the costs of this action.

23  **SECOND CLAIM FOR RELIEF**

24  **FALSE ADVERTISING (CALIFORNIA BUSINESS AND PROFESSIONS CODE, § 17500)**

25  **(Against All Defendants)**

26  122.   Plaintiffs incorporate by reference all of the above allegations as if fully set forth

27  herein.

28  123.   Plaintiffs have standing to sue under California Business and Professions Code, §

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1   17500, as they have suffered injury in fact and lost money as a result of Uber's actions as set forth

2   herein.  Uber's false and misleading advertising practices have injured Plaintiffs, as potential

3   customers of Plaintiffs—who, due to Uber's misrepresentations, mistakenly believe that they will

4   be safer if they travel via UberX—spurn Plaintiffs' taxi cabs for UberX rides, resulting in lost

5   revenue for Plaintiffs.  In addition, Uber's misrepresentations cause major reputational harm to

6   Plaintiffs, as Uber's unlawful advertising causes consumers to doubt the safety of Plaintiffs' taxi

7   cab rides, vehicles, and drivers, and to have, overall, a lessened view of Plaintiffs.  Uber's

8   advertising practices cause further injuries to Plaintiffs as alleged herein.

9        124.    Uber has engaged in false advertising, as it has disseminated false and misleading

10   representations about its services, and falsely and misleadingly compared its services to those

11   offered by Plaintiffs.

12        125.    Uber knew or should have known by exercising reasonable care that its

13   representations were false and misleading.  Uber has engaged in false advertising in violation of

14   Cal. Bus. & Prof. Code §§ 17500, *et seq.* by misrepresenting in its advertising and marketing of its

15   services to the consuming public that, as explained herein, it offers a safer transportation

16   experience than Plaintiffs.

17        126.    Each of the aforementioned representations alleged in this Complaint were false

18   and misleading because UberX's drivers and vehicles are subjected to safety standards that are less

19   strict than those to which Plaintiffs' taxi cabs and drivers are subjected.

20        127.    By disseminating and publishing these statements in connection with the sale of

21   Uber's transportation services, Uber has engaged in and continues to engage in false advertising in

22   violation of Cal. Bus. & Prof. Code §§ 17500, *et seq.*

23        128.    Uber's conduct, as set forth herein, was a substantial factor in causing harm to

24   Plaintiffs and allowing Uber to receive ill-gotten gains and/or profits, including but not limited to,

25   money.  Therefore, Uber has been unjustly enriched.  Pursuant to Cal. Bus. & Prof. Code § 17535,

26   Plaintiffs request restitution and restitutionary disgorgement for all sums obtained in violation of

27   Cal. Bus. & Prof. Code §§ 17500, *et seq.*

28        129.    Plaintiffs seek injunctive relief, restitution, and restitutionary disgorgement of

1    Uber's ill-gotten gains, as specifically provided in Cal. Bus. & Prof. Code § 17535.

2        130.    Plaintiffs seek to enjoin Uber from engaging in these wrongful practices, as alleged

3    herein, in the future. There is no other adequate remedy at law and if an injunction is not ordered,

4    Plaintiffs will suffer irreparable harm and/or injury.

5                              **THIRD CLAIM FOR RELIEF**

6    **UNFAIR COMPETITION (CALIFORNIA BUSINESS AND PROFESSIONS CODE, §**
                                      **17200)**
7
                              **(Against All Defendants)**
8

9        131.    Plaintiffs incorporate by reference all of the above allegations as if fully set forth

10   herein.

11       132.    Plaintiffs have standing to sue under California Business and Professions Code, §

12   17200, as they have suffered injury in fact and lost money as a result of Uber's actions as set forth

13   herein. Uber's false and misleading advertising practices have injured Plaintiffs, as potential

14   customers of Plaintiffs—who, due to Uber's misrepresentations, mistakenly believe that they will

15   be safer if they travel via UberX—spurn Plaintiffs' taxi cabs for UberX rides, resulting in lost

16   revenue for Plaintiffs. In addition, Uber's misrepresentations cause major reputational harm to

17   Plaintiffs, as Uber's unlawful advertising causes consumers to doubt the safety of Plaintiffs' taxi

18   cab rides, vehicles, and drivers.

19       133.    Uber's business acts and practices, as alleged herein, are unlawful within the

20   meaning of California's Unfair Competition Law because, amongst other reasons, they constitute

21   false advertising in violation of the Lanham Act (15 U.S.C. § 1125) and California's False

22   Advertising Law (Cal. Bus. and Prof. Code, § 17500).

23       134.    Uber's business acts and practices, as alleged herein, are unfair within the meaning

24   of California's Unfair Competition Law because the advertisements, which mislead customers in

25   various ways (including by inaccurately suggesting that these customers will get a "safer" ride by

26   choosing an UberX ride over a taxi cab ride) have threatened and harmed competition.

27       135.    Uber's business acts and practices, as alleged herein, are also fraudulent within the

28   meaning of California's Unfair Competition Law, as customers are inaccurately led to believe that

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1   UberX offers a safer alternative to rides in Plaintiffs' taxi cabs, when—in reality—Plaintiffs offer

2   a safer experience than UberX.  Specifically, Uber acted and/or acts fraudulently by, for example,

3   (1) claiming that it offers "BACKGROUND CHECKS YOU CAN TRUST," (2) asserting that its

4   background checks are "developed using industry-leading standards," and (3) claiming that "our

5   background checking process and standards are . . . often more rigorous than what is required to

6   become a taxi driver," when, in reality, taxi cab drivers in Plaintiffs' taxi cabs undergo more

7   stringent background checks (through the use of Live Scan fingerprinting technology).

8         136.    Similarly, Uber acts fraudulently by, for example, claiming that it offers the

9   "SAFEST RIDES ON THE ROAD," when (1) Plaintiffs' taxi cab drivers, unlike UberX drivers,

10  are subjected to background checks that utilize Live Scan testing, (2) nearly all of the taxi cab

11  drivers driving in Plaintiffs' taxi cabs, unlike UberX drivers, are required to take a driver safety

12  training course and/or receive other valuable safety training before they can begin transporting

13  passengers, (3) most of the taxi cab drivers driving in Plaintiffs' taxi cabs, unlike UberX drivers,

14  are required to pass a written examination before they can begin driving customers, (4) Plaintiffs'

15  taxi cabs are subject to vehicle inspections and/or maintenance standards far more intensive than

16  the 19-point vehicle inspection procedure required by Uber for UberX cars, and (5) taxi cab

17  drivers driving in Plaintiffs' taxi cabs are prohibited from using dispatch services provided by

18  other taxi cab companies, whereas UberX drivers frequently work for one of Uber's competitors

19  (e.g., Lyft), and thus can become distracted by ride requests on multiple cell phones.

20        137.    Uber has profited substantially and received ill-gotten gains from its unfair,

21  unlawful, and fraudulent business practices.  It profits from the payments that it receives from

22  customers (which would otherwise go to Plaintiffs) and it profits generally from its increased

23  market share and enhanced reputation, as well as the diminished reputation of Plaintiffs that

24  results from the false and misleading advertisements of Uber.

25        138.    Uber's conduct, as set forth herein, was a substantial factor in causing harm to

26  Plaintiffs and allowing Uber to receive ill-gotten gains and/or profits, including but not limited to,

27  money.  Therefore, pursuant to California Business and Professions Code § 17203, Plaintiffs

28  request restitution and restitutionary disgorgement of all profits generated from sums wrongfully

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1   obtained by Uber.

2       139.    Also pursuant to California Business and Professions Code § 17203, Plaintiffs seek

3   an order of this Court enjoining Uber from continuing to engage in unlawful, unfair, or deceptive

4   business practices and any other act prohibited by law, including those set forth in the Complaint.

5   **VII.**    **<u>PRAYER FOR RELIEF</u>**

6       WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf, and against

7   Uber, adjudging and decreeing that:

8       1.    Uber's false and misleading statements violate the Lanham Act, California's False

9   Advertising Law, and California's Unfair Competition Law, and Plaintiffs have been injured in

10  their businesses as a result of Uber's violations;

11      2.    Plaintiffs shall recover compensatory damages.  Plaintiffs shall also recover up to

12  three times their damages as provided by the Lanham Act, and shall recover Uber's profits;

13      3.    Plaintiffs shall receive restitution and restitutionary disgorgement of all profits

14  Uber generated from sums wrongfully obtained;

15      4.    Uber, its subsidiaries, affiliates, successors, transferees, assignees, and the

16  respective officers, directors, partners, agents, and employees thereof and all other persons acting

17  or claiming to act on its behalf shall be preliminarily and permanently enjoined and restrained

18  from continuing to engage in the unlawful, unfair, and/or fraudulent practices alleged in the

19  Complaint (including disseminating false and misleading statements pertaining to the safety of

20  UberX rides and/or rides with taxi cab companies such as Plaintiffs), or for other equitable relief

21  that the Court deems just and proper;

22      5.    Plaintiffs shall recover both pre-judgment and post-judgment interest at the

23  maximum allowable rate on any amounts awarded;

24      6.    Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees

25  as provided by law; and

26      7.    Plaintiffs receive such other or further relief as may be just and proper.

27

28

PEARSON, SIMON & WARSHAW, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

DATED: March 18, 2015

PEARSON, SIMON & WARSHAW, LLP
BRUCE L. SIMON
BENJAMIN E. SHIFTAN

By: _____/s/ Bruce L. Simon_____
BRUCE L. SIMON

DATED: March 18, 2015

THE DOLAN LAW FIRM
CHRISTOPHER B. DOLAN

By: _____/s/ Christopher B. Dolan_____
CHRISTOPHER B. DOLAN

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

DATED: March 18, 2015

PEARSON, SIMON & WARSHAW, LLP
BRUCE L. SIMON
BENJAMIN E. SHIFTAN

By: _____/s/ Bruce L. Simon_____
BRUCE L. SIMON

DATED: March 18, 2015

THE DOLAN LAW FIRM
CHRISTOPHER B. DOLAN

By: _____/s/ Christopher B. Dolan_____
CHRISTOPHER B. DOLAN