UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.A. TAXI COOPERATIVE, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC., et al.,<br><br>Defendants. | Case No. 15-cv-01257-JST<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br>Re: ECF No. 16 |

Before the Court is a motion to dismiss filed by Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC. ECF No. 16. For the reasons set forth below, the Court will grant the motion in part and deny it in part.

## I. BACKGROUND

### A. Factual Allegations

For the purpose of deciding this motion to dismiss, the Court accepts as true the following allegations from Plaintiffs' complaint. See ECF No. 1.

Plaintiffs are nineteen California corporations and limited liability companies that provide taxi services throughout California, including San Francisco County, Los Angeles County, and San Diego County. Compl. ¶¶ 4, 11-29, 34. Defendant Uber Technologies, Inc. ("Uber") is a transportation network company that uses a smart phone application ("app") to connect passengers looking for rides with drivers willing to provide rides. Id. ¶¶ 5, 30. Defendants Rasier, LLC and Rasier-CA, LLC are subsidiaries of Uber. Id. ¶¶ 31-32. The parties operate in the same cities and counties, and vie for the same customers. Id. ¶¶ 36-37.

#### 1. Statements Relating to Safety

As part of its advertising campaign, Uber makes various statements about the safety of rides on Uber's platform, and disparages the safety of rides offered by taxi cab companies. Id. ¶ 1.

For example, Uber's website boasts that it offers the "SAFEST RIDES ON THE ROAD" and that Uber is "GOING THE DISTANCE TO PUT PEOPLE FIRST." Id. ¶ 42. The website also states, "Wherever you are around the world, Uber is committed to connecting you to the safest ride on the road. That means setting the strictest safety standards possible, then working hard to improve them every day." Id. ¶ 43. It promises, "SAFE PICKUPS," with "No more waiting alone on a dark street hoping you can hail a taxi." Id. ¶ 46.

Uber's blog, which is easily accessible from its website, includes the following statement from Uber's Head of Communications—North America, Lane Kasselman:

> Uber works hard to ensure that we are connecting riders with the safest rides on the road. The current efforts we are undertaking to protect riders, drivers and cities are just the beginning.
>
> We'll continue innovating, refining, and working diligently to ensure we're doing everything we can to make Uber the safest experience on the road.

Id. ¶ 44. Another statement on the blog, issued after an Uber driver struck and killed a six-year old girl, reads, "We are committed to improving the already best in class safety and accountability of the Uber platform, for both riders and drivers." Id. ¶ 45.

Statements concerning safety also appear in information provided to Uber customers by email after they complete a ride using Uber. Id. ¶¶ 47-48. The email message includes a bill with a fare breakdown, including a $1.00 "Safe Rides Fee." Id. ¶ 48. Customers who click on a question mark next to the words "Safe Rides Fee" are directed to a website that includes the following information:

> From the beginning, we've always been committed to connecting you with the safest rides on the road. The Safe Rides fee is a fee added to uberX fares on behalf of drivers (who may pay this fee to Uber) in cities with uberX ridesharing. This Safe Rides Fee supports continued efforts to ensure the safest possible platform for Uber riders and drivers . . . . For complete pricing transparency, you'll see this as a separate line item on every uberX receipt.

Id. ¶¶ 49-50.

Uber's advertising campaign emphasizes the rigor of its background checks for drivers. Id. ¶ 55. The website promises, "BACKGROUND CHECKS YOU CAN TRUST," explaining that "Every ridesharing and livery driver is thoroughly screened through a rigorous process we've

2

developed using constantly improving standards . . . ." Id. ¶ 56. Until at least October 29, 2014, the website stated, "Every ridesharing and livery driver is thoroughly screened through a rigorous process we've developed using *industry-leading* standards." Id. ¶ 57 (emphasis added).

On Uber's blog, Kasselman elaborates on Uber's background check procedure:

> All Uber ridesharing and livery partners must go through a rigorous background check. The three-step screening we've developed across the United States, which includes county, federal, and multi-state checks, has set a new standard. . . . We apply this comprehensive and new industry standard consistently across all Uber products, including uberX.
>
> Screening for safe drivers is just the beginning of our safety efforts. Our process includes prospective and regular checks of drivers' motor vehicle records to ensure ongoing safe driving. Unlike the taxi industry, our background checking process and standards are consistent across the United States and often more rigorous than what is required to become a taxi driver.

Id. ¶ 58. Until at least December 10, 2014, this post stated that Uber drivers "must go through a rigorous background check that leads the industry." Id. ¶ 59. Similarly, until October 2014, the website explaining the "Safe Rides Fee" stated that the fee "supports our continued efforts to ensure the safest possible platform for Uber riders and drivers, including an industry-leading background check process." Id. ¶ 60.

In addition, Uber has made statements to the media concerning the superior safety of Uber rides. These statements include the following statement made by an Uber representative to NBC's Detroit affiliate:

> What I can tell you is that Uber takes passenger safety very seriously. We work every day to connect riders with the safest rides on the road and go above and beyond local requirements in every city we operate.
>
> Uber only partners with drivers who pass an industry-leading screening that includes a criminal background check at the county, federal and multi-state level going back as far as the law allows. We also conduct ongoing reviews of drivers' motor vehicle records during their time as an Uber partner.
>
> . . .
>
> For more information on what makes Uber the safest rides on the road, please see our website . . . .

Id. ¶ 63. An April 29, 2014, article entitled "Faulty Background Checks May Put UberX

Passengers at Risk, Report Says," similarly quotes an Uber representative as stating:

> Uber's industry-leading background checks help connect consumers with the safest ride on the road . . . . Our driver partner background checks are more thorough than those of taxi [sic] in most cities . . . . We continue to improve and are always working hard to tighten our policies and processes to ensure that Uber remains the safest transportation option available.

Id. ¶ 64. Finally, a June 25, 2014, NBCBayArea.com news report quotes an Uber representative as saying, "We're confident that every ride on the Uber platform is safer than a taxi." Id. ¶ 65.

### 2. Practices and Policies Relating to Safety

Plaintiffs allege that Uber's representations about the safety of its rides are false and misleading because Plaintiffs offer safer transportation than Uber. Id. ¶¶ 66-67. First, Plaintiffs' drivers must submit to Live Scan, which is "considered the gold standard of background checks." Id. ¶¶ 69-70. Live Scan uses fingerprint identification; analyzes information in Department of Justice and Federal Bureau of Investigation systems that have no time-based or jurisdictional limitations; and continuously refreshes the results of a person's background check. Id. ¶ 70. By contrast, Uber's background checks, which are run by a private third-party company, do not involve fingerprinting; have jurisdictional and time-based limits; and are not automatically updated to reflect new information. Id. ¶¶ 74-76. For these reasons, Uber is not employing the most effective background checks available. Id. ¶¶ 80-81.

Second, Plaintiffs' drivers, unlike Uber drivers, are required to take a driver safety course and/or other safety training and to pass a written examination before transporting passengers. Id. ¶¶ 82, 86. Third, Plaintiffs' vehicle safety inspections and maintenance standards are more stringent than those required by Uber. Id. ¶¶ 90-91. Fourth, unlike Uber drivers, Plaintiffs' drivers are prohibited from driving for more than one company, which ensures that they are focused on transporting passengers, rather than toggling between dispatch services. Id. ¶¶ 94-96. Because Uber drivers often also drive for a ridesharing competitor such as Lyft, Inc., they can be distracted by attempting to manage ride requests on multiple platforms, often using more than one cellphone. Id. ¶¶ 96-97.

### 3. Harm to Competitors

Uber's false and misleading advertisements cause harm to Plaintiffs because they convince customers that Uber offers safer rides than taxi companies. Id. ¶ 102. As a result of Uber's representations about safety, customers choose to use Uber rather than taking a taxi, causing Plaintiffs to lose significant revenue and suffer reputational injury. Id. ¶¶ 102-106.

## B. Procedural History

Plaintiffs' complaint, filed on March 18, 2015, alleges violations of (1) the Lanham Act, 15 U.S.C. § 1125(a); (2) California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 ("FAL"); and (3) California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL"). Compl. ¶¶ 110-39.

On May 14, 2015, Defendants filed the instant motion to dismiss the action for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 16. Plaintiffs oppose the motion. ECF No. 31.

## C. Jurisdiction

The Court has jurisdiction over this action pursuant to 28 U.S.C. sections 1331 and 1367.

## II. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Fed R. Civ. P. 8(a)(2); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." Knievel v. ESPN, 393 F.3d 1068, 1072 (9th Cir. 2005).

## III. DISCUSSION

Defendants argue first that Plaintiffs' complaint should be dismissed because it fails to plead an actionable statement. Second, they argue that Plaintiffs are not entitled to the relief they seek under the UCL and FAL.

### A. Whether Alleged Statements are Actionable

To state a claim for false advertising under the Lanham Act, Plaintiffs must allege:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product;
> (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience;
> (3) the deception is material, in that it is likely to influence the purchasing decision;
> (4) the defendant caused its false statement to enter interstate commerce; and
> (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

Skydive Ariz., Inc. v. Quattrocchi, 673 F.3d 1105, 1110 (9th Cir. 2012). "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997).

Similarly, California's UCL "prohibits any 'unlawful, unfair or fraudulent business act or practice.'" Williams v. Gerber Prods. Co., 552 F.3d 934, 938 (9th Cir. 2008) (quoting Cal. Bus. & Prof. Code § 17200). The FAL "prohibits any 'unfair, deceptive, untrue, or misleading advertising.'" Id. (quoting Cal. Bus. & Prof. Code § 17500). Under the "reasonable consumer" standard applicable to Plaintiffs' claims under these California statutes, Plaintiffs must show that "members of the public are likely to be deceived." Id. (quoting Freeman v. Time, Inc., 68 F.3d 285, 289 (9th Cir. 1995)). "The California Supreme Court has recognized 'that these laws prohibit not only advertising which is false, but also advertising which [,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'" Id. (quoting Kasky v. Nike, Inc., 27 Cal. 4th 939, 951 (2002)). These claims "are substantially

6

1   congruent to claims made under the Lanham Act." <u>Kwan Software Eng'g, Inc. v. Foray Techs.,
2   LLC</u>, No. 12-cv-03762-SI, 2014 WL 572290, at *3 (N.D. Cal. Feb. 11, 2014).[1]

Defendants contend that Plaintiffs have failed to plead an actionable statement because the challenged statements: (1) are not quantifiable and specific; (2) are couched in terms of aspiration or optimism; (3) are taken out of context; and/or (4) are not commercial advertising. ECF No. 16 at 2-3.

### 1. Puffery

Defendants argue first that all of the challenged statements are non-actionable puffery and that the complaint should therefore be dismissed in its entirety. ECF No. 16 at 3-5; see <u>Newcal Indus., Inc. v. Ikon Office Solution</u>, 513 F.3d 1038, 1053 (9th Cir. 2008) ("the determination of whether an alleged misrepresentation 'is a statement of fact' or is instead 'mere puffery' is a legal question that may be resolved on a Rule 12(b)(6) motion."). In the Ninth Circuit:

> A statement is considered puffery if the claim is extremely unlikely to induce consumer reliance. Ultimately, the difference between a statement of fact and mere puffery rests in the specificity or generality of the claim. The common theme that seems to run through cases concerning puffery in a variety of contexts is that consumer reliance will be induced by specific rather than general assertions. Thus, a statement that is quantifiable, that makes a claim as to the specific or absolute characteristics of a product, may be an actionable statement of fact while a general, subjective claim about a product is non-actionable puffery.

<u>Newcal Indus.</u>, 513 F.3d at 1053 (internal citations and quotation marks omitted) (citing <u>Cook, Perkiss, & Liehe v. N. Cal. Collection Serv.</u>, 911 F.2d 242, 245-46 (9th Cir. 1990)). "Puffing is exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely." <u>Southland Sod Farms</u>, 108 F. 3d at 1145 (internal quotation marks omitted).

Certain alleged statements, such as the claim that Uber is "GOING THE DISTANCE TO PUT PEOPLE FIRST," Compl. ¶ 42, are clearly the type of "exaggerated advertising" slogans upon which consumers would not reasonably rely. See <u>Southland Sod Farms</u>, 108 F. 3d. at 1145

---

[1] The parties agree that the analysis for whether the challenged advertising statements are actionable is substantially the same for Plaintiffs' claims under the Lanham Act, the UCL, and the FAL. See ECF No. 16 at 2; ECF No. 31 at 5 n.6.

1  ("Less is More" claim was "precisely the type of generalized boasting upon which no reasonable
2  buyer would rely"). There is no discernible way to measure whether or how Uber might be "going
3  the distance to put people first." Similarly, the phrase "BACKGROUND CHECKS YOU CAN
4  TRUST," Compl. ¶ 56, is a general, subjective statement that makes no specific claim about
5  Uber's services. These statements are therefore non-actionable puffery.

6  Other alleged statements, however, do include "specific" assertions that seem to describe
7  "absolute characteristics" of Uber's services that could be tested. See Newcal Indus., 513 F.3d at
8  1053. For example, Uber claims that it is "setting the strictest safety standards possible," that its
9  safety is "already best in class," and that its "three-step screening" background check procedure,
10  which includes "county, federal and multi-state checks," adheres to a "comprehensive and new
11  industry standard." Compl. ¶¶ 43, 45, 58. Uber has historically described its background check
12  procedures as "industry-leading." Id. ¶¶ 59, 60. Uber's statements also explicitly compare the
13  safety of its services with those offered by taxi cab companies. For example, a statement on
14  Uber's blog describing its "rigorous" background check procedures reads, "Unlike the taxi
15  industry, our background checking process and standards are consistent across the United States
16  and often more rigorous than what is required to become a taxi driver." Id. ¶ 58.

17  A reasonable consumer reading these statements in the context of Uber's advertising
18  campaign could conclude that an Uber ride is objectively and measurably safer than a ride
19  provided by a taxi or other competitor service, i.e., it is statistically most likely to keep riders from
20  harm. References to the "strictest safety standards" and explicit comparisons with competitor taxi
21  services reinforce the impression that Uber's statements are grounded in fact. See, e.g., In re
22  Toyota Motor Corp. Unintended Acceleration Mktg., Sales, Practices, and Prods. Liab. Litig., 754
23  F. Supp. 2d 1145, 1177 (C.D. Cal. 2010) ("[T]he allegations about product safety are more than
24  'mere puffery' that Toyota's cars were superior to others. They constitute a campaign by Toyota
25  in which it represented itself as prioritizing (even 'obsessing over') safety."); Star Child II, LLC v.
26  Lanmar Aviation, Inc., No. 11-cv-01842-AWT, 2013 WL 1103915, at *4 (D. Conn. Mar. 16,
27  2013) (statement that defendant "had implemented the most stringent safety standards is outside
28  the ken of mere puffery" because it "is a statement of fact"); Giles v. Inflatable Store, Inc., No. 07-

cv-00401-PAB-KLM, 2009 WL 961469, at *4 (D. Colo. Apr. 6, 2009) ("A reasonable jury could determine that the word 'safest' has a specific, quantifiable meaning: . . . most likely (among all competing products) to keep participants from harm."); Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 708 F. Supp. 2d 1209, 1244 (D.N.M. 2010) ("The Court finds that the bulk of these statements – 'safer,' 'more efficiently,' 'easier,' 'quicker' – are objectively verifiable and that a reasonable consumer might believe that the seller had engaged in some sort of testing before making these statements. They are therefore not puffing."); Anunziato v. eMachines, Inc., 402 F. Supp. 2d 1133, 1140-41 (C.D. Cal. 2005) (the phrase "most stringent quality control tests" is "a specific factual assertion which could be established or disproved through discovery, and hence is not mere puffery"). At this stage in the litigation, the Court cannot conclude that the challenged statements, considered together, are all "exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely." Southland Sod Farms, 108 F. 3d at 1145. Defendants' argument that the complaint should be dismissed in its entirety for failure to plead an actionable statement therefore fails.[2]

### 2. "Aspirational Statements"

Second, Defendants argue that certain advertising statements they describe as "aspirational" are non-actionable puffery because there is no way to quantify or prove false "generalized statements of aspiration and optimism." ECF No. 16 at 5-6 (citing City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 183 (2d Cir. 2014)). According to Uber, statements such as, "We are committed to improving the already best in class safety and accountability of the Uber platform, for both riders and drivers," Compl. ¶ 45, are non-actionable because any claims about safety are couched in aspirational language that makes Uber's claims too vague and subjective to support Plaintiffs' false advertising claims.

---

[2] Although some of the challenged statements may not be actionable, on a motion to dismiss the relevant question is whether plaintiffs have sufficiently pled a claim regarding the defendant's statements in their totality. This is not a motion to strike. See In re Royal Ahold N.V. Sec. & ERISA Litig., 351 F. Supp. 2d 334, 399 (D. Md. 2004) ("While some of the statements cited by plaintiffs will not be actionable, at this stage of the proceedings, I need not address each individual statement allegedly made by the defendants to make that determination").

To the extent Uber contends that our cases delineate a category of "aspirational statements" that are immune from liability under the false advertising laws, the Court rejects the argument. Defendants are correct that statements "generally describing the 'high priority'" a company places on certain efforts may constitute puffery. Glen Holly Entm't, Inc. v. Tektronix, Inc., 352 F.3d 367, 379 (9th Cir. 2003). But Defendants cite no authority in support of the proposition that the simple addition of phrases such as "Uber is committed to . . .," "Uber works hard to . . .," or "We're doing everything we can to . . ." to an advertising statement automatically shields a defendant from liability. See Compl. ¶¶ 43-45. In Pontiac Policemen's and Firemen's Retirement System, a securities action, the court noted that "general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,'" and stated that "[t]his is particularly true where, as here, the statements are explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'" 752 F.3d at 183. In Glen Holly Entertainment, the court examined statements that product development was a "high priority" and concluded that the statements at issue were "generalized, vague and unspecific," and therefore puffery. 352 F.3d at 379. The use of an "aspirational" phrase was not conclusive in either court's analysis and did not alter the relevant inquiry. Where a challenged statement includes "aspirational" language, a court must still determine whether it "is extremely unlikely to induce consumer reliance." Newcal Indus., 513 F.3d at 1053.

Here, the challenged statements do not merely assert that Uber places a high priority on safety. They also incorporate assertions that a reasonable consumer might rely on as based in fact. For example, Uber claims that, "We are committed to improving the already best in class safety and accountability of the Uber platform, for both riders and drivers." Compl. ¶ 45. This statement makes claims concerning both Uber's commitment to safety and the objective safety and accountability of its platform. And while Uber's claims concerning its corporate commitment may not be measurable and may therefore be dismissed by readers as puffery, a reasonable consumer could conclude that Uber's "best in class safety" is an objective fact. Because the statements classified by Defendants as "aspirational" include plausibly measurable factual claims, Defendants' motion to dismiss as to these alleged statements is denied.

10

### 3. Context

Defendants also contend that the complaint should be dismissed because it impermissibly and misleadingly takes statements out of context. ECF No. 16 at 6-8. More specifically, they argue that Plaintiffs have focused on general, subjective statements amounting to puffery, while ignoring specific, factual statements relating to safety, the truth of which they do not dispute. For example, Plaintiffs do not dispute that Uber screens criminal records going back seven years and conducts county, federal, and multi-state checks. ECF No. 35 at 7-8.

This argument holds water only if the statements concerning safety that are challenged in Plaintiffs' complaint are not actionable. As explained above, a reasonable consumer might conclude that Uber's claims that its rides are safest, its standards are strictest, and its background check procedures are more rigorous than competitors' are based in objectively measurable fact, and might reasonably rely upon them in deciding whether or not to use Uber. Plaintiffs allege that these factual claims are false, in part because a background check that screens records going back seven years and involves county, federal, and multi-state checks is not an "industry-leading" background check. See Compl. ¶¶ 68-81. Plaintiffs need not allege that every factual statement in Defendants' advertising materials is false in order to state a false advertising claim.

### 4. Commercial Advertising

To constitute commercial advertising or promotion under the Lanham Act, a representation must be:

> 1) commercial speech; 2) by a defendant who is in commercial competition with plaintiff; 3) for the purpose of influencing customers to buy defendant's goods or services. While the representations need not be made in a 'classic advertising campaign,' but may consist instead of more informal types of 'promotion,' the representations 4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion within that industry.

Rice v. Fox Broad. Co., 330 F.3d 1170, 1181 (9th Cir. 2003) (quoting Coastal Abstract Serv. v. First Am. Title Ins. Co., 173 F.3d 725, 735 (9th Cir. 1999)). Here, Defendants argue that several of the challenged statements are not actionable because they are not commercial advertising.[3] ECF

---

[3] Defendants argue, and Plaintiffs do not dispute, that because Plaintiffs' UCL and FAL claims are

11

No. 16 at 8-10.

### a.   Media Statements

"'[T]he core notion of commercial speech' is that it 'does no more than propose a commercial transaction.'" Hoffman v. Capital Cities/ABC, Inc., 255 F.3d 1180, 1184 (9th Cir. 2001) (quoting Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66 (1983)). Statements made to the media and published in a journalist's news article concerning a matter of public importance are not commercial speech, and are protected under the First Amendment. Boule v. Hutton, 328 F.3d 84, 91 (2d Cir. 2003); see also id. ("we have been careful not to permit overextension of the Lanham Act to intrude on First Amendment values"); Mattel, Inc. v. MCA Records, Inc., 296 F.3d 894, 906 (9th Cir. 2002) ("If speech is not 'purely commercial' – that is, if it does more than propose a commercial transaction – then it is entitled to full First Amendment protection.").

Here, several of the challenged statements were made by Uber representatives to journalists and published in independent online articles.[4] Compl. ¶¶ 62-65; Declaration of A. Matthew Ashley in Support of Defendants' Motion to Dismiss, ECF No. 16-2, ¶¶ 6-8, Ex. D ("Local 4 Defenders: Is Uber X safe?"), Ex E. ("Faulty Background Checks May Put UberX Passengers at Risk, Report Says"); Ex. F ("Is Uber Keeping Riders Safe?"). Each article discusses whether using Uber is safe, and each includes responsive statements from an Uber representative. Because the challenged statements are "inextricably intertwined" with the reporters' coverage of a matter of public concern, i.e. whether Uber is safe for riders, they cannot constitute commercial speech actionable under the Lanham Act. TYR Sport, Inc. v. Warnaco Swimwear, Inc., 709 F. Supp. 2d 802, 818 (C.D. Cal. 2010); see also Nat'l Servs. Grp. Inc. v. Painting and Decorating Contractors of Am., Inc., No. 06-563-CJC (ANX), 2006 WL 2035465, at *5 (C.D. Cal. July 18, 2006) ("Where particular speech includes commercially-motivated statements that are inextricably

---

based on the same false advertising theory, the same test applies to those claims. ECF No. 16 at 8 n.3 (citing Rice, 330 F.3d at 1182).

[4] Although the articles at issue are not attached to the complaint, they are incorporated by reference and the Court may therefore consider them in deciding the motion to dismiss. See Knievel, 393 F. 3d at 1076 ("[T]he 'incorporation by reference' doctrine . . . permits us to take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." (internal quotation marks omitted)).

intertwined with otherwise fully protected speech, the entirety of the speech may be fully protected" (internal quotation marks omitted)).

Plaintiffs argue that Uber's statements constitute commercial speech notwithstanding the fact that they appear in journalistic articles, citing Kasky v. Nike, Inc., 27 Cal. 4th 939 (2002), and SKEDCO, Inc. v. ARC Prods., LLC, No. 13-cv-00696-HA, 2014 WL 2465577 (D. Or. June 2, 2014). ECF No. 31 at 12. But these cases are inapposite. Kasky involved statements written by the defendant and distributed as press releases and letters to the editor, rather than statements made in response to journalists' inquiries and published in independent news articles. 27 Cal. 4th at 947-48. And in SKEDCO, the statements at issue, which highlighted the newest features of SKEDCO's products, were made in a published interview with a company executive. 2014 WL 2465577 at *5-6. The interview appeared in a specialized magazine targeted toward the business's primary customer and was placed in close proximity to a paid advertisement. Id. Here, the challenged statements are one part of longer, independent articles that are largely critical of Uber.

Because the challenged statements made to the media are not commercial speech, the motion to dismiss is granted as to those statements.[5]

### b.   Receipts

Defendants also contend that statements made about Uber's "Safe Rides Fee" on users' emailed receipts are not commercial speech because they are made after a user completes a ride. ECF No. 16 at 10. Therefore, Uber argues, they relate to transaction that has already occurred, rather than proposing a transaction or influencing consumers to purchase Uber's services in the future. See Rice, 330 F.3d at 1181 (a commercial advertising statement must be made "for the purpose of influencing consumers to buy defendant's goods or services"); Gonzalez v. Allstate Ins. Co., No. 04-cv-1548-FMC (PJWx), 2005 WL 5891935, at *8 (C.D. Cal. Aug. 2, 2005) (notices relating to commercial transactions that have already occurred and that require no action by the customer are not commercial speech).

---

[5] Although the Court generally will not consider a motion to dismiss that applies to fewer than all the challenged statements in a complaint, see n.2 supra, in this instance Uber's statements to the media comprise a clearly defined category, and the parties treat them as such. The Court therefore follows the parties' lead.

1    Plaintiffs respond that because Uber relies on passengers repeatedly using its services, and
2    because users receive a receipt including a link to the "Safe Rides Fee" information each time they
3    complete an Uber ride, it is plausible that passengers who use Uber and read the information about
4    the "Safe Rides Fee" are influenced to use the service again.  ECF No. 31 at 14-15.  The complaint
5    alleges that statements like "This Safe Rides Fee supports continued efforts to ensure the safest
6    possible platform for Uber riders and drivers," bolster consumers' expectations that Uber provides
7    the safest ride possible, and that users "*will be* receiving a ride safer than that provided by
8    Plaintiffs' taxi cabs."  Compl. ¶¶ 50-52 (emphasis added).  Furthermore, the explanation of the
9    "Safe Rides Fee" promises "continued efforts to ensure the safest possible platform," and explains
10   that "you'll see this as a separate line item on every uberX receipt," demonstrating Uber's
11   expectation that customers will ride again.  Id. ¶ 50.

12   Read in the light most favorable to the Plaintiffs, the complaint adequately alleges that the
13   statements relating to the "Safe Rides Fee" are made for the purpose of influencing consumers to
14   use Uber's services again.  See Heartland Payment Sys., Inc. v. Mercury Payment Sys., LLC, No.
15   14-cv-0437-CW, 2014 WL 5812294, at *6 (N.D. Cal. Nov. 7, 2014) ("[T]he monthly [billing]
16   statements could induce merchants to continue using Mercury's services, and hence could be
17   considered commercial speech designed to propose a continued business relationship.").[6]  Uber's
18   motion to dismiss the complaint as to statements made in connection with the "Safe Rides Fee" is
19   therefore denied.

---

[6] The business press has frequently observed that all communications between a successful firm and its customers, including post-sale communications, should encourage consumer loyalty and repeat business.  See, e.g., Chad Brooks, *Customer Loyalty: 5 Tips for Sales Reps*, BUSINESS NEWS DAILY (Feb. 10, 2014, 11:49 AM), http://www.businessnewsdaily.com/5901-customer-retention-sales-tips.html ("Sales representatives need to establish a positive two-way business relationship with customers in order to encourage future business transactions. . . . The 'end' doesn't really come when you close a deal.  Instead, the relationship should evolve into one of trust − the relationship should provide a return on investment for the customer."); Alex Lawrence, *Five Customer Retention Tips for Entrepreneurs*, FORBES (Nov. 1, 2012, 1:16 PM), http://www.forbes.com/sites/alexlawrence/2012/11/01/five-customer-retention-tips-for-entrepreneurs/ ("it's far easier . . . to sell to existing customers than to brand new prospects").

**B.     Availability of Relief under the UCL and FAL**

    **1.     Standing under the UCL**

"[T]o state a claim for a violation of the [California UCL], a plaintiff must allege that the defendant committed a business act that is either fraudulent, unlawful, or unfair." Levine v. Blue Shield of Cal., 189 Cal. App. 4th 1117, 1136 (2010). Defendants argue that Plaintiffs lack standing to seek relief under any of these three prongs, and that their UCL claim must therefore be dismissed. ECF No. 16 at 11-12.

Defendants argue first that Plaintiffs lack standing to seek relief under the UCL's fraud prong because they do not allege that they relied on Uber's allegedly false or misleading advertising. The California Supreme Court has held that "the amended UCL 'imposes an actual reliance requirement on plaintiffs' who bring a UCL action 'based on a fraud theory involving false advertising and misrepresentations to consumers' because 'reliance is the causal mechanism of fraud.'" Heartland Payment Sys., Inc. v. Mercury Payment Sys., LLC, No. 14-cv-0437-CW, 2015 WL 3377662, at *6 (N.D. Cal. Feb. 24, 2015) (quoting In re Tobacco II Cases, 46 Cal. 4th 298, 326-28 & n.17 (2009)). Federal courts sitting in California have disagreed, however, about whether competitor plaintiffs must plead their own reliance, or whether pleading consumer reliance is sufficient for fraudulent business practices claims brought by competitors. Id. at *7; see also id. ("No California court has addressed . . . this issue.").

Most courts have concluded that Plaintiffs must allege their own reliance on the alleged misrepresentations, rather than the reliance of third parties. See U.S. Legal Support, Inc. v. Hofioni, No. 13-cv-01770-LKK/AC, 2013 WL 6844756, at *15 (E.D. Cal. Dec. 20, 2013) ("As Plaintiff is not a consumer of Defendants' services, it cannot demonstrate reliance on Defendants' fraudulent statements in order to establish standing under the UCL's fraud prong"); O'Connor v. Uber Techs., Inc., 58 F. Supp. 3d 989, 1002 (N.D. Cal. 2014) ("UCL fraud plaintiffs must allege their *own* reliance – not the reliance of third parties – to have standing under the UCL"); ZL Techs., Inc. v. Gartner, Inc., No. 09-cv-2393-JF(RS), 2009 WL 3706821, at *11 (N.D. Cal. Nov. 4, 2009) (accepting defendant's argument that plaintiff alleging only the reliance of potential customers, and not its own reliance, lacked standing to bring UCL claim sounding in fraud). On

15

the other hand, in VP Racing Fuels, Inc. v. Gen. Petroleum Corp., a district court concluded that pleading customer reliance was sufficient to state a competitor's claim under the fraudulent prong of the UCL. No. 09-cv-02067-MCE-GGH, 2010 WL 1611398, at *2 (E.D. Cal. Apr. 20, 2010) ("Plaintiff has been injured by consumer reliance upon Defendant's misrepresentations which have resulted in competitive harm and diverted sales"); see also id. at 3 n.3 (recognizing that, in passing Proposition 64, California voters sought "to limit standing under the UCL in order to prevent abusive UCL actions by attorneys whose clients had not been injured in fact or used the defendant's product or service," but concluding that a corporation bringing a UCL cause of action as a competitor "is not the type of plaintiff whose standing was targeted by California voters through Proposition 64").

The Court joins the majority of courts to have addressed this question and concludes that because Plaintiffs do not plead their own reliance on Uber's allegedly false advertising, they lack standing to seek relief under the UCL's fraud prong. In describing the "actual reliance requirement," the California Supreme Court explained that "[r]eliance is proved by showing that the defendant's misrepresentation or nondisclosure was an immediate cause of *the plaintiff's* injury-producing conduct." In re Tobacco II Cases, 46 Cal. 4th at 326 (emphasis added) (internal quotation marks omitted); see also Kwikset Corp. v. Superior Court, 51 Cal. 4th 310, 327 n.10 (2011) ("a UCL fraud plaintiff must allege he or she was motivated to act or refrain from action based on the truth or falsity of a defendant's statement"). Furthermore, in general, outside the context of the UCL, "a fraud action cannot be maintained based on a third party's reliance." City and Cnty. of San Francisco v. Philip Morris, Inc., 957 F. Supp. 1130 (N.D. Cal. 1997) (citing Mirkin v. Wasserman, 5 Cal. 4th 1082, 1088 (1993)).

Because Plaintiffs' claims under the UCL's unfair and unlawful prongs are predicated on the same misrepresentation theory, they similarly lack standing to seek relief under those prongs. In re Facebook PPC Adver. Litig., 09-cv-03043-JF, 2010 WL 3341062, at *11 (N.D. Cal. Aug. 25, 2010) ("Because Plaintiff's allegations . . . are premised on a fraud theory involving misrepresentations and omissions, they must allege reliance, irrespective of whether the claims are asserted under the fraud prong or the unfair prong of the UCL"); O'Connor, 58 F. Supp. 3d at

1003 ("Tobacco II's actual reliance requirement applies equally to the unlawful prong of the UCL when the predicate unlawfulness is misrepresentation and deception" (emphasis and internal quotation marks omitted)). Accordingly, the UCL claim will be dismissed.

### 2. Restitution

Finally, Defendants argue that Plaintiffs have no claim for restitution under the UCL or FAL because they have no direct or vested ownership interest in Uber's products. ECF No. 16 at 12-13. See Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1149 (2003); BizCloud, Inc. v. Computer Sciences Corp., 13-cv-05999-JCS, 2014 WL 1724762, at *4 (N.D. Cal. Apr. 29, 2014) (dismissing UCL claim seeking disgorgement of profits by competitor).

Plaintiffs do not dispute that restitution under the UCL and FAL is limited to "money or property that defendants took directly from [a] plaintiff" or "in which [a plaintiff] has a vested interest." ECF No. 31 at 16 & n.24 (citing Innovation Ventures, LLC v. Pittsburg Wholesale Grocers, Inc., No. 12-cv-05523-WHA, 2013 WL 1007666, at *7 (N.D. Cal. Mar. 13, 2013); In re Vioxx Class Cases, 180 Cal. App. 4th 116, 131 n.15 (2009)). They argue, however, that it is too early to determine definitively whether Plaintiffs are entitled to restitution because "Uber has not proven as a matter of law that Plaintiffs did not have confirmed, unconditional business from particular customers that was usurped by Uber." ECF No. 31 at 17.

The problem for Plaintiffs is that the complaint, as written, seeks only "restitution and restitutionary disgorgement for all sums obtained in violation" of the California statutes, Compl. ¶¶ 128, 138; it does not allege an ownership interest in any of those profits or a "confirmed" contractual relationship with any of Uber's customers. Consequently, Plaintiffs seek "exactly the type of nonrestitutionary disgorgement precluded under Korea Supply." Luxpro Corp. v. Apple Inc., No. 10-cv-03058-JSW, 2011 WL 3566616, at *8 (N.D. Cal. Aug. 12, 2011) (concluding that plaintiff had alleged facts sufficient to state a claim for restitution only to the extent its claims were premised on its interest in profits and/or revenues from alleged contracts with eleven identified entities).

### CONCLUSION

For the foregoing reasons, the motion to dismiss is granted in part and denied in part.

1 Defendants' motion to dismiss the Lanham Act claim is granted only to the extent the claim is
2 based on protected speech in the media. The motion to dismiss the UCL claim is granted. The
3 motion to strike Plaintiffs' claim for restitution pursuant to the FAL is granted. Plaintiffs may file
4 an amended complaint by August 3, 2015.

    IT IS SO ORDERED.

Dated: July 17, 2015

    JON S. TIGAR
    United States District Judge