# EXHIBIT A

1 | GEORGE GASCÓN, SBN 182345
District Attorney of San Francisco
2 | JUNE D. CRAVETT, SBN 105094
Assistant Chief District Attorney
3 | EVAN H. ACKIRON, SBN 164628
Managing Assistant District Attorney
4 | ERNST A. HALPERIN, SBN 175493
Assistant District Attorney
5 | NANCY TUNG, SBN 203236
Assistant District Attorney
6 | GREGORY M. ALKER, SBN 204838
Assistant District Attorney
7 | PHOEBE MAFFEI, SBN 271346
Assistant District Attorney
8 | 732 Brannan Street
San Francisco, California 94103
9 | Telephone: (415) 551-9545

10 | JACKIE LACEY, SBN 110808
District Attorney of the County of Los Angeles
11 | STANLEY PHILLIP WILLIAMS, SBN 106658
Head Deputy District Attorney
12 | HOON CHUN, SBN 132516
Assistant Head Deputy District Attorney
13 | JEFFREY MCGRATH, SBN 131702
Deputy District Attorney
14 | 201 N. Figueroa Street, Suite 1200
Los Angeles, CA 90012
15
| *Attorneys for Plaintiff,*
16 | The People of the State of California

ENDORSED
F I L E D
Superior Court of California
County of San Francisco

DEC 09 2014

CLERK OF THE COURT
BY: _____ MARY A. MORAN
Deputy Clerk

17 |        SUPERIOR COURT OF THE STATE OF CALIFORNIA
18 |              CITY AND COUNTY OF SAN FRANCISCO
                      UNLIMITED JURISDICTION
19

| 20 | THE PEOPLE OF THE STATE OF CALIFORNIA, | Case No.   CGC-14-543120 |
|---|---|---|
| 21 | Plaintiff, | |
| 22 | vs. | COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTIES, RESTITUTION AND OTHER EQUITABLE RELIEF |
| 23 | UBER TECHNOLOGIES, INC., a Delaware Corporation; RASIER, LLC, a Delaware Limited Liability Company; RASIER-CA, LLC, a Delaware Limited Liability Company; and DOES 1 through 100, inclusive, | |
| 24 | | Business & Professions Code Sections 17200 *et seq.* & 17500 *et seq.* |
| 25 | | |
| 26 | Defendants. | |
| 27 | | |

1        Plaintiff, the People of the State of California, by George Gascón, District Attorney for the

2  City and County of San Francisco, and Jackie Lacey, District Attorney for the County of Los

3  Angeles (collectively "Plaintiff"), hereby allege the following upon information and belief:

PARTIES AND VENUE

5     1.    The authority of the District Attorneys for the City and County of San Francisco and

6  the County of Los Angeles to bring this action is derived from the statutory law of the State of

7  California, specifically Business and Professions Code sections 17200 *et seq.* and 17500 *et seq.*

8     2.    Defendant UBER TECHNOLOGIES, INC. is a Delaware corporation with its

9  headquarters and primary place of business located in the City and County of San Francisco at

10  1455 Market Street, San Francisco, CA 94103.

11     3.    Defendant RASIER, LLC is a Delaware limited liability company. It is a subsidiary

12  of UBER TECHNOLOGIES, INC. and licenses technology from defendant UBER

13  TECHNOLOGIES, INC.

14     4.    Defendant RASIER-CA, LLC is a Delaware limited liability company. It is a

15  subsidiary of UBER TECHNOLOGIES, INC. RASIER-CA, LLC has obtained a Class P

16  Transportation Network Company Permit from the California Public Utilities Commission

17  ("CPUC")

18     5.    The true names and capacities, whether individual, corporate, associate, or otherwise,

19  of the defendants sued herein under the fictitious names of DOES 1 through 100, inclusive, are

20  unknown to Plaintiff, who therefore sues said defendants by such fictitious names. Each

21  fictitiously named defendant is responsible in some manner for the violations of law herein

22  alleged. Plaintiff will amend its complaint to show the true names and capacities of such

23  defendants, as well as the manner in which each fictitious defendant is responsible for the

24  violations of law herein alleged, when these facts are ascertained.

25     6.    At all relevant times, each defendant has committed the acts, caused others to commit

26  the acts, ratified the commission of the acts, or permitted others to commit the acts alleged in this

27  complaint and has made, caused, ratified, or permitted others to make, the untrue or misleading

1  statements alleged in this complaint.  Whenever reference is made in this complaint to any act of

2  defendants, such allegation shall mean that each defendant acted individually and jointly with the

3  other defendants.  UBER TECHNOLOGIES, INC., RASIER, LLC, and RASIER-CA, LLC shall

4  be referred to collectively as "Uber," and the term "defendants" wherever used in this complaint

5  shall mean all named defendants.

6      7.    Whenever in this complaint reference is made to any act of any corporate

7  defendant, such allegation shall be deemed to mean that such corporate defendant did the acts

8  alleged in the complaint through its officers, directors, agent, employees, and/or

9  representatives while they were acting within the actual or ostensible scope of their authority.

10     8.    Defendants at all times mentioned herein have transacted business within the City and

11 County of San Francisco, the County of Los Angeles and throughout the State of California.  The

12 violations of law herein described have been committed within and from the City and County of

13 San Francisco, in the County of Los Angeles, and elsewhere within the State of California.

14     9.    The actions of the defendants, as hereinafter set forth, are in violation of the laws

15 and public policies of the State of California and are inimical to the rights and interests of the

16 general public as consumers, competitors and citizens.  Unless Plaintiff is granted the remedies

17 sought herein, including injunctive relief by order of this Court, defendants will continue to

18 engage in the unlawful acts and practices set forth below and will continue to cause injury and

19 harm to the general public.

20                          INTRODUCTION

21     10.   Uber provides prearranged transportation services for compensation through its

22 subsidiaries, using an online-enabled smartphone application ("the Uber App") to connect

23 passengers with drivers.  Uber provides different levels of service, at different prices.  Uber calls

24 these different service levels "platforms."  In California, Uber brands these levels of service with

25 names such as "uberPOOL," "UberX," "UberXL," "UberPLUS," "UberBLACK," and

26 "UberSUV."  The UberBLACK and UberSUV services are restricted to drivers who also work for

27 individuals or companies that are separately registered with the California Public Utilities

Commission as "Transportation Charter Party Carriers" ("TCPs"). Uber allows drivers who are not driving a car registered as a TCP vehicle to collect fares using the "uberPOOL," "UberX," and "UberXL," platforms. These drivers often use their own cars. Uber also provides a service to connect customers with taxi cabs, which it calls "UberTAXI."

11.   For each passenger trip, Uber controls the financial transaction between the customer, Uber, and the driver. A customer hails an Uber driver through the Uber App downloaded on the customer's smartphone; Uber calculates the customer's fare based upon location information from a GPS enabled mobile device; Uber receives the customer fare by charging the credit card the customer provided to Uber when registering her personal information on the Uber App; and then Uber pays the Uber driver's portion of the fare to the driver. Uber retains a portion of every fare, commonly 20% and sometimes more. The core service being provided by Uber – passenger transportation for compensation on public roadways – has implications for the safety of Uber's customers, third parties, and public and private property.

12.   Through this civil enforcement action, Plaintiff seeks to address Uber's flagrant and unlawful business practices, including its practice of: (1) making untrue or misleading representations regarding the measures it takes to ensure customer safety in order to induce people to get into a stranger's car; (2) using the Uber App to calculate fares based upon a measurement of time and distance without first obtaining the statutorily required approval of the California state agency charged with ensuring that measuring technology is accurate, reliable, and does not facilitate fraud; (3) conducting operations at California airports without obtaining authorization from the airport authorities; (4) charging a misleading $4.00 "Airport Fee Toll" to customers of its UberX service who travel to San Francisco International Airport; and (5) charging a misleading $1.00 "Safe Rides Fee" to all of its customers who use the UberX platform. Plaintiff also seeks civil penalties for each of these unlawful business acts and practices, as well as full restitution for all California consumers who paid any amount designated as an "Airport Fee Toll" which was not in fact charged by or paid to the airport authority, and full restitution for all California consumers who paid any amount designated as a "Safe Rides Fee."

1

GENERAL ALLEGATIONS

2

<u>UNTRUE OR MISLEADING REPRESENTATIONS ABOUT SAFETY MEASURES</u>

3

*Uber's General Statements About Safety and Background Checks*

4      13.  Uber's business model depends upon convincing its customers it is safe to get into a

5   stranger's car despite its admission, buried in its terms and conditions, that its customers "may be

6   exposed to transportation that is potentially dangerous, offensive, harmful to minors, unsafe or

7   otherwise objectionable."  In a successful effort to do so, Uber makes a number of representations

8   on its webpages, in communications with customers and in the media designed to create the

9   impression that Uber does everything it can to ensure its customers' safety.  These include, but are

10   not limited to, the representations set forth below.

11      14.  Under the tagline "SAFEST RIDE ON THE ROAD – Going the Distance to Put

12   People First" on Uber's prominent "Safety" webpage (www.uber.com/safety), Uber represents that,

13   "Wherever you are around the world, Uber is committed to connecting you to the safest ride on the

14   road."

15

16

17

18

19

20

21

22

23

24

25

26



27

Wherever you are around the world, Uber is committed to connecting you to the safest ride on the road. That means setting the strictest safety standards possible, then working hard to improve them every day. The specifics vary depending on what local governments allow, but within each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security – what we're doing in the US is an example of our standards around the world.

1    15.   Uber expands on this theme, explaining below the picture of a young girl riding in an

2   Uber car, "That means setting the strictest safety standards possible, then working hard to improve

3   them every day.  The specifics vary, depending upon what local governments allow, but within

4   each city we operate, we aim to go above and beyond local requirements to ensure your comfort

5   and security – and what we're doing in the US is an example of our standards around the world."

6    16.   On the same page (www.uber.com/safety) under the tagline, "RIDER SAFETY,"

7   Uber introduces the centerpiece of its advertising about customer safety: "BACKGROUND

8   CHECKS YOU CAN TRUST."  Through the end of October, 2014, Uber represented to its

9   customers, "Every ridesharing and livery driver is thoroughly screened through a rigorous process

10   we've developed using industry-leading standards. This includes a three-step criminal background

11   screening for the U.S. — with county, federal and multi-state checks that go back as far as the law

12   allows — and ongoing reviews of drivers' motor vehicle records throughout their time on Uber."

# RIDER SAFETY

From the moment you request a ride to the moment you arrive, the Uber experience has been designed from the ground up with your safety in mind.



## BACKGROUND CHECKS YOU CAN TRUST

Every ridesharing and livery driver is thoroughly screened through a rigorous process we've developed using industry-leading standards. This includes a three-step criminal background screening for the U.S. – with county, federal and multi-state checks that go back as far as the law allows – and ongoing reviews of drivers' motor vehicle records throughout their time on Uber.

READ MORE

27   In November of 2014, Uber changed the words "industry-leading" to "constantly improving."

1   17.  The "read more" link on the "BACKGROUND CHECKS YOU CAN TRUST"

2   segment of Uber's "Safety" page connects readers to an April 25, 2014 entry on the Uber blog

3   (http://blog.uber.com/driverscreening) in which Lane Kasselman, Uber's Head of Communications

4   for the Americas, expands further on Uber's theme.  The current version of the April 25, 2014

5   Kasselman's blog entry states that, "All Uber ridesharing and livery partners must go through a

6   rigorous background check that leads the industry. . . .Screening for safe drivers is just the

7   beginning of our safety efforts.  Our process includes prospective and regular checks of drivers'

8   motor vehicle records to ensure ongoing safe driving.  Unlike the taxi industry, our background

9   checking process and standards are consistent across the United States and often more rigorous

10   than what is required to become a taxi driver."

POLICY

# UBER BACKGROUND CHECKS

APRIL 25 2014
POSTED BY LANE

All Uber ridesharing and livery partners must go through a rigorous background check that leads the industry. The three-step screening we've developed across the United States, which includes county, federal and multi-state checks, has set a new standard. These checks go back 7 years, the maximum allowable by the Fair Credit Reporting Act. We apply this comprehensive and new industry standard consistently across all Uber products, including uberX.

Screening for safe drivers is just the beginning of our safety efforts. Our process includes prospective and regular checks of drivers' motor vehicle records to ensure ongoing safe driving. Unlike the taxi industry, our background checking process and standards are consistent across the United States and often more rigorous than what is required to become a taxi driver.

25   18.  Kasselman's blog entry ends, "Uber works hard to ensure that we are connecting

26   riders with the safest rides on the road. The current efforts we are undertaking to protect riders,

27   drivers and cities are just the beginning. We'll continue innovating, refining, and working

1  diligently to ensure we're doing everything we can to make Uber the safest experience on the
2  road."

3      19. Repeating this theme, in a June 25, 2014 NBCBayArea.com news report, Uber
4  spokesperson Kasselman is quoted as saying, "We're confident that every ride on the Uber
5  platform is safer than a taxi."

6  *Uber's Representations About The Safe Rides Fee*

7      20. Uber reinforces the message about its efforts to ensure customer safety and the
8  quality of its background checks when it charges UberX customers a $1.00 "Safe Rides Fee,"
9  which is separately itemized on the electronic receipt sent to the customer.



23      21. Next to the words "Safe Rides Fee" is a question mark that hyperlinks to an
24  explanation of the Safe Rides Fee. Beginning with Uber's April 2014 introduction of the "Safe
25  Rides Fee" through the end of October, 2014, the hyperlink connected to the following explanation
26  stating that the fee is used to support, among other things, "an industry-leading background check
27  process."

## What Is The Safe Rides Fee?

> From the beginning, we've always been committed to connecting you with the safest rides on the road. The Safe Rides Fee is a small fee added to uberX fares on behalf of drivers in cities with uberX ridesharing. This Safe Rides Fee supports continued efforts to ensure the safest possible platform for Uber riders and drivers, including an industry-leading background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and more. For complete pricing transparency, you'll see this as a separate line item on every uberX receipt.
>
> In the U.S., the Safe Rides Fee is always $1 USD. In Canada, it is $1 CAD.

22.   In October of 2014, Uber changed the words "industry-leading" to "a Federal, state, and local background check."  Uber continues to represent to the public that it is committed to rider safety, claiming that the Safe Rides Fee "supports continued efforts to ensure the safest possible platform for Uber riders and drivers . . . ."

23.   The representations made by Uber set forth in the foregoing paragraphs are untrue or misleading in violation of California law.  Viewed separately or together, the representations are likely to mislead consumers into believing that Uber does everything it can to ensure their safety when, in fact, the centerpiece of Uber's customer safety assurances — the background check process Uber describes as "industry-leading" and touts as "often more rigorous than what is required to become a taxi driver" — does not use fingerprint identification and therefore cannot ensure the information Uber obtains from a background check actually pertains to the applicant.

24.   Instead, of using fingerprints, Uber's background check process relies upon its drivers to submit personal identifiers (name, address, driver's license number and state, and social security number) through an online webpage.  Uber provides this information to Hirease, Inc., the private company that performs its background checks.  This process cannot ensure that the information in the background check report is actually associated with the applicant since it does

1 | not use a unique biometric identifier such as a fingerprint.  In fact, the sample report Hirease posts

2 | on its website has a disclaimer stating, "Final verification of an individual's identity and proper use

3 | of report contents are the user's responsibility."

4 |      25.  Because of inaccuracies in background check information provided by private

5 | companies, California's Investigative Consumer Reporting Agencies Act requires those

6 | companies to include on the first page of every background check report a notice, in at least

7 | 12-point boldface type, setting forth that "the report does not guarantee the accuracy or

8 | truthfulness of the information as to the subject of the investigation, but only that it is accurately

9 | copied from public records, and information generated as a result of identity theft, including

10 | evidence of criminal activity, may be inaccurately associated with the consumer who is the subject

11 | of the report."

12 |      26.  By contrast, the taxi regulators in the most populous parts of California require

13 | drivers to undergo criminal background checks using fingerprint identification employing a

14 | technology called "Live Scan."   Taxi regulators in Uber's home town of San Francisco, as well as

15 | California's most populous city – Los Angeles, the rest of the 10 most populous cities in

16 | California, and all 34 cities in Orange County all require Live Scan.  Live Scan fingerprinting in

17 | California occurs at a facility designated by the California Department of Justice.  The fingerprints

18 | allow a biometric search of the California Department of Justice's criminal history databases and

19 | the option to obtain a search of the Federal Bureau of Investigation's database of multistate

20 | criminal history information.  The process of using a biometric identifier to search government

21 | databases through the California Department of Justice ("Live Scan/DOJ Process") is the gold

22 | standard for a background check process in California.

23 |      27.  Because of the unique identifying characteristics of fingerprints, the Live Scan/DOJ

24 | Process provides assurance that the person whose criminal history has been run is, in fact, the

25 | applicant.  This would ensure that a registered sex offender could not use his law-abiding brother's

26 | identification information to become an Uber driver.  It would also ensure that a convicted burglar

27 | could not borrow his cousin's identification information to become an Uber driver in order to case

1 | the empty homes of customers he takes to the airport.

2 |     28. Uber's own background check provider, Hirease, explains why a fingerprint-based

3 | background check process is far superior: "Fingerprinting helps uncover criminal history not

4 | discovered through traditional methods, offers extra protection to aid in meeting industry

5 | guidelines, and helps prevent fraud."

6 |     29. Uber's representations concerning the quality of its background check process are

7 | untrue or misleading. Contrary to Uber's multiple representations that it employs "background

8 | checks you can trust," that it uses a background check process that "leads the industry," and that its

9 | background check process is "often more rigorous than what is required to become a taxi driver,"

10 | Uber's background check process does not provide the level of security provided by the

11 | fingerprint-based Live Scan/DOJ Process employed for performing background checks on taxi

12 | drivers in California's most populous cities.

13 | *Uber's Misleading Statements In Response To Incidents Involving Its Drivers*

14 |     30. During the past year, Uber has consistently repeated its misleading statements about

15 | the quality of its background checks and commitment to safety in response to a series of well-

16 | publicized incidents involving Uber drivers.

17 |     31. In January 2014, online news site PandoDaily.com reported that an Uber driver in

18 | San Francisco who had been accused of verbally and physically assaulting a passenger had a

19 | significant criminal history which should have disqualified him from becoming an Uber driver. In

20 | June 2014, Forbes.com reported that the driver had been on probation for a battery conviction

21 | when Uber hired him in October 2013. When questioned about the decision to allow an applicant

22 | with a conviction for violent crime to drive for Uber, spokesperson Kasselman told NBC Bay Area

23 | News that "Uber works with Hirease to conduct stringent background checks, which all drivers

24 | must undergo and clear to partner with Uber." Kasselman then claimed that the driver "had a

25 | clean background check in October."

26 | //

27 | //

32. On December 31, 2013, an Uber driver struck and killed a six-year-old girl while driving in San Francisco. In response to the incident, the next day Uber posted a "Statement on New Year's Eve Accident" on its blog in which the company represented, "We are committed to improving the already best in class safety and accountability of the Uber platform, for both riders and drivers." Two weeks after Uber made its statement, the San Francisco Business Times reported that the driver had been convicted of reckless driving in Florida in September 2004.

33. In February 2014, the Chicago Tribune reported that a 24-year-old Uber driver had a felony conviction for residential burglary in 2010, a misdemeanor conviction for criminal damage to property in 2009, another misdemeanor conviction in 2008 for breaking into a car to steal a GPS and satellite radio receiver, a history of speeding tickets, and had his license suspended twice in 2008. Uber posted an apology on its website: "[W]e have already taken steps to prevent this from happening again, by expanding our background check process to set new industry-leading standards. . . We are sincerely sorry for this error, and want to assure all riders that we are taking the necessary steps to fix it and build the safest option for consumers."

34. Two months later, on April 24, 2014, an NBC television affiliate in Los Angeles aired an investigative report about Uber's driver background checks in which the station enlisted a woman to apply to become an Uber driver. She was on felony probation for making criminal threats (willfully threatening to commit a crime which will result in death or great bodily injury to another person), and during the broadcast described the conduct leading to her arrest: "I pulled a girl out of a car and almost beat her to death." On March 3, 2014, Uber sent the woman an email notifying her that she passed her background check. According to the NBC report, Uber would not respond to the station's request for comment about this case. Instead, Uber spokesperson Lane Kasselman sent an email explaining Uber's background screening policy. The email ended with, "We're confident that every ride on Uber is safer than a taxi."

35. In July 2014, WDIV-TV 4 in Detroit broadcast a segment on an investigation it had performed in which it found Uber drivers who had previously had their licenses suspended, Uber drivers who had been in a serious accident with injuries, Uber drivers with speeding tickets, Uber

1    drivers who been cited for no proof of insurance, and Uber drivers who were driving vehicles

2    registered to other people. In response to the report, Uber spokesperson Lauren Altmin issued this

3    statement: "We work every day to connect riders with the safest rides on the road and go above

4    and beyond local requirements in every city we operate. Uber only partners with drivers who pass

5    an industry-leading screening that includes a criminal background check at the county, federal and

6    multi-state level going back as far as the law allows. We also conduct ongoing reviews of drivers'

7    motor vehicle records during their time as an Uber partner. . . . For more information on what

8    makes Uber the safest rides on the road, please see our website: https://www.uber.com/safety."

9       36. Uber's response to well-publicized incidents involving its drivers is to repeat its

10   misleading mantra about the quality of its background check process, and to continue to assure the

11   public that it does everything it can to ensure its customers' safety. Uber continues to repeat its

12   claims that it aims "to go above and beyond local requirements to ensure your comfort and

13   security," that it "is committed to connecting you to the safest ride on the road," that it makes

14   "continued efforts to ensure the safest possible platform for Uber riders," and that it goes "above

15   and beyond local requirements in every city we operate."

16       37. These representations are untrue or misleading. At the same time Uber was stating

17   that it is "working diligently to ensure we're doing everything we can to make Uber the safest

18   experience on the road," it was instead working diligently to ensure it was doing everything it

19   could to successfully defeat a bill pending in the California legislature that would have actually

20   made Uber safer for its customers and the public. Introduced in the 2013-2014 California

21   legislative session, Assembly Bill 612 would have made three important changes to current

22   California law.

23       38. First, the legislation would have required Transportation Network Companies

24   ("TNCs") to use the Live Scan/DOJ Process to obtain background check information from the

25   same government repositories of criminal history information used by law enforcement. The

26   legislative analysis prepared for hearings by the Assembly Committee on Transportation noted that

27   existing California Public Utilities Commission regulations allow TNCs to "use a third party firm

1  that fails to provide a comprehensive search." The analysis stated that the bill would provide "a

2  uniform process by using the DOJ system to ensure the most comprehensive and updated data of

3  an employee is provided . . . ."

4      39. Second, the legislation would have required mandatory controlled substance and

5  alcohol testing for TNC drivers. This would have provided a mechanism for identifying drivers

6  with substance abuse problems before a rider or member of the public was hurt, and would have

7  put teeth into Uber's "Zero Tolerance Policy" which currently relies upon after-the-fact complaints

8  from riders.

9      40. Third, the legislation would have required TNCs to participate in the Department of

10  Motor Vehicles Employer Pull Notice Program ("EPN"). Participants in the program receive

11  automatic notification of any driving-related convictions, failures to appear in court, accidents,

12  driver's license suspensions or revocations, and any other actions taken against the driving

13  privileges of their drivers. Although Uber represents to the public that it conducts "ongoing

14  reviews of drivers' motor vehicle records during their time as an Uber partner," the company does

15  not choose to participate in EPN, and therefore does not receive automatic and timely notification.

16  While Uber does not disclose how often it checks its drivers' motor vehicle records, under current

17  California law it is only required to do so quarterly.

18      41. Within six weeks of creating a blog posting devoted to safety in which Uber

19  represented, "We'll continue innovating, refining, and working diligently to ensure we're doing

20  everything we can to make Uber the safest experience on the road," Uber mounted a campaign to

21  defeat Assembly Bill 612. As part of this campaign, Uber created its June 11, 2014 blog posting

22  with the heading "California: Get on Board" in which it described the legislation as "a flagrant

23  attempt to stymie innovation and competition." Uber listed the names and contact information for

24  all of the members of the California Senate Energy, Utilities and Communications Committee,

25  encouraged the public to contact the legislators to oppose the bill, and provided a link for the

26  public to "tweet your support for Uber in California!"

27  //

1    42. As a result of its successful efforts, Uber is not required to fingerprint drivers during

2  the application process, is not required to test its drivers for abuse of controlled substances and

3  alcohol that could impair their ability to drive safely, and is not required to participate in the

4  program that would provide automatic notification of significant events reflecting on its drivers'

5  ability to drive safely. Moreover, contrary to its representations that it goes "above and beyond

6  local requirements in every city we operate," Uber has not chosen to do any of these things

7  voluntarily.

8    43. Uber's untrue or misleading representations regarding the measures it takes to ensure

9  customer safety, taken together and separately, have violated and continue to violate California

10  Business and Professions Code sections 17500 and 17200. Uber has violated the law by making

11  these representations on its website, to the media, on its blog, in response to news stories and, as

12  previously stated, in connection with each receipt Uber sends to an UberX customer, which it does

13  in California thousands if not tens of thousands of times each day.

14
15
COMMERCIAL USE OF THE UBER APP TO MEASURE TIME AND DISTANCE
WITHOUT APPROVAL OF THE CALIFORNIA DEPARTMENT OF FOOD AND AGRICULTURE

16    44. Before any weighing or measuring device can be sold or used in California, it must

17  first be evaluated and approved by the Department of Food and Agriculture. This process is

18  known interchangeably as "type certification," "certification," or "type evaluation." The process

19  examines the design, features, operating characteristics, and performance of devices for

20  compliance with legal requirements. Its purpose is to ensure devices are accurate, reliable, and do

21  not facilitate fraud.

22    45. California Business and Professions Code section 12500.5 prohibits anyone from

23  using a weighing, measuring or counting instrument or device for commercial purposes in the

24  State of California without first obtaining approval of the measuring or counting instrument or

25  device from the California Department of Food and Agriculture. Business and Professions Code

26  section 12500.5 states, in relevant part:

27  //

> *It shall be unlawful to sell or use for commercial purposes any weight or measure, or any weighing, measuring, or counting instrument or device, of a type or design that has not first been so approved by the department . . . .*

46.  The California Department of Food and Agriculture's Division of Measurement Standards ("DMS") reviews and certifies the accuracy of weighing, measuring, and counting instruments or devices that are used for commercial purposes in California.  DMS's mission is to ensure the accuracy of commercial weighing and measuring devices in order to ensure fair competition for industry and accurate value comparison for consumers.

47.  DMS has adopted, by regulation and pursuant to statute, the latest standards for tolerances, specifications, and other technical requirements recommended by the National Conference on Weights and Measures and published in the National Institute of Standards and Technology Handbook 44, "Specifications, Tolerances, and other Technical Requirements for Weighing and Measuring Devices" ("Handbook 44 Standards").  The National Conference on Weights and Measures is a voluntary organization that develops model standards.  California's Business and Professions Code permits the Secretary of the California Department of Food and Agriculture to establish tolerances and specifications for commercial weighing and measuring devices not governed by the Handbook 44 Standards, and the Secretary does so when necessary.

48.  DMS's type evaluation of weighing, measuring, and counting instruments or devices includes type evaluation of any software written to interact with, control, connect into, or receive output from, a commercial weighing or measuring system or device.  Such software is "an accessory used or connected therewith" under California Business and Professions Code section 12500, subdivisions (a) and (b), and must be evaluated.

49.  Uber uses the Uber App technology to measure time and distance in order to calculate its customers' fares.  The Privacy Policy Effective July 13, 2013 that Uber posts on its website discloses this fact:

//

//

*If you are traveling in a vehicle requested via our Services, the driver's mobile phone will send your GPS coordinates, during the ride, to our servers. Most GPS enabled mobile devices can define one's location to within 50 feet. We collect this information for various purposes – including to determine the charge for the transportation you requested via our Services, to provide you with customer support, to send you promotions and offers, to enhance our Services, and for our internal business purposes.*

50.   In order to obtain type evaluation of a measuring technology, an applicant must submit a written application for type evaluation and one or more of the applicant's measuring devices preloaded with any controlling software as part of the type evaluation process. Submission of a device and its controlling software is necessary to enable DMS's type evaluation personnel to verify that the measuring device operates within the specifications and tolerances established by the California Department of Food and Agriculture, and that the measuring device does not facilitate fraud.  DMS evaluates the software and any other component of a weighing or measuring device as part of the type evaluation process.  Submission of a device and its controlling software also allows DMS to determine which of the Handbook 44 Standards is applicable to components of the particular technology, or in cases where the Handbook 44 Standards do not govern, to establish tolerances and specifications for the particular technological components which have a metrological effect on the device.

51.   The Uber App technology is a "measuring instrument" within the meaning of California Business and Professions Code section 12500, subdivision (b), which states, "'Measuring instrument' means any device, contrivance, apparatus, or instrument used, or designed to be used, for ascertaining measure and includes any tool, appliance, or accessory used or connected therewith."

52.   Since at least 2010, Uber has been using its Uber App technology in California to calculate each and every fare without having ever submitted the Uber App technology to DMS for type evaluation.

53.   Uber has violated and continues to violate Business and Professions Code section 12500.5 with each use of the Uber App technology to calculate a customer's fare in California.

54.    In October, 2010, the San Francisco Municipal Transit Agency sent Uber a cease-and-desist letter in which it informed Uber that, "Because you have a system that measures time and distance, you are clearly in violation of type certification requirements that are placed upon such devices by the Department of Agriculture's Weights and Measures Division." Uber did not cease operations in San Francisco, and did not submit the Uber App technology to DMS for type evaluation.

55.    In December of 2012, DMS contacted Uber's CEO Travis Kalanick to discuss type evaluation of the Uber App technology. That same month the Director of the Consumer Protection Safety Division of the California Public Utilities Commission ("the CPUC") forwarded to Mr. Kalanick an email from the DMS Director explaining that the Uber App technology must be type evaluated by DMS and that Business and Professions Code section 12500.5 prohibits the commercial use of a measuring device that has not been type evaluated by DMS. Despite correspondence over several months between Uber CEO Kalanick and the DMS Director, Uber never submitted the Uber App for certification.

56.    DMS continued its efforts to convince Uber to comply with the law over the next year and, in December of 2013, the DMS Director wrote a formal letter to CEO Kalanick requesting a meeting to discuss the steps Uber must take to obtain type evaluation of the Uber App technology. On February 14, 2014, the DMS Director and Chief of Enforcement met with representatives from Uber, including in-house counsel and Uber's outside counsel. The DMS Director sent a detailed confirming letter to Uber's outside counsel on February 28, 2014. In the letter, the Director informed Uber that a DMS evaluator was available to test the Uber App technology beginning March 25, 2014, and asked Uber to contact the DMS Enforcement Division to arrange for submission of the Uber App technology to DMS.

57.    Uber once again did not submit the Uber App technology to DMS for type evaluation. On April 7, 2014, the DMS Director wrote Uber another letter in which she informed Uber that it must immediately submit the Uber App technology for type evaluation.

//

1    58.  In response to the April 7, 2014 letter, a member of Uber's public policy group, Sally

2    Kay, left a voice mail for the DMS Enforcement Branch Chief.  When they spoke by telephone on

3    or about April 16, 2014, the Enforcement Branch Chief reiterated to Ms. Kay that Uber must

4    submit the Uber App technology for type evaluation, and offered to provide assistance to Uber

5    with the application forms.  Ms. Kay responded that she knew where to find the information.

6    59.  A week later Ms. Kay sent the Enforcement Branch Chief an email saying, "Hi

7    Steve, didn't want you to think I had forgotten about you!  Just got some new staff on board that

8    may be able to help with this.  Thanks for understanding!  Talk soon, Sally Kay."

9    60.  Despite Ms. Kay's assurances, Uber took no further action to comply with the law.

10   On October 10, 2014, the DMS Director sent Uber yet another letter directing Uber to submit the

11   Uber App technology for type evaluation.  She gave Uber a deadline of October 17, 2014 to

12   submit the Uber App technology to DMS.

13   61.  Uber ignored the October 17, 2014 deadline, and continues to violate the law each

14   time it uses its non-approved Uber App technology to calculate a customer fare in California,

15   which it does thousands if not tens of thousands of times each day.

16              UNLAWFUL OPERATION AT CALIFORNIA AIRPORTS

17   62.  In January of 2013, Uber CEO Travis Kalanick signed a term sheet with the

18   California Public Utilities Commission ("CPUC") that allowed Uber to operate pending the

19   CPUC's rulemaking proceedings.  As a condition of the term sheet, Kalanick agreed that Uber

20   drivers "shall not transport passengers for hire onto airport property unless such transportation

21   provider possesses the requisite authority or license from the airport authority involved."

22   63.  On September 23, 2013, when the CPUC issued Rulemaking 12-12-011 Decision

23   13-09-045 ("Decision 13-09-045"), the Commission mandated that, "TNCs shall not conduct any

24   operations on the property of or into any airport unless such operations are authorized by the

25   airport authority involved."

26   64.  On April, 7, 2014 the California Public Utilities Commission issued a permit to Uber

27   ("Uber CPUC Permit") to operate as a Transportation Network Company ("TNC") in California.

1   The Uber CPUC Permit explicitly states that the company continues to be subject to Decision 13-
2   09-045's restriction against airport operations: "This permit does not authorize the Carrier to
3   conduct operations on the property of or into any airport unless such operation is authorized by the
4   airport authority involved."

5       65.   Uber has operated and continues to operate at airports throughout California in
6   violation of Decision 13-09-045, the Uber CPUC Permit, and state law every day.  In the first
7   seven months of 2014, Los Angeles International Airport issued more than 260 citations to Uber
8   drivers and impounded vehicles.  In a six-month period in 2014 before Uber signed a permit to
9   operate at San Francisco International Airport, authorities there issued more than 540 warnings and
10  citations to Uber drivers.  These represent a tiny fraction of the unauthorized trips by Uber drivers
11  to these California airports during any given six month period.  Each unauthorized trip to a
12  California airport by an Uber driver constitutes a violation of the terms of Decision 13-09-045, a
13  violation of the terms of the Uber CPUC permit, a violation of state law pursuant to California
14  Public Utilities Code section 5411, and a trespass.

15      66.   In April, 2013, San Francisco International Airport's Deputy Airport Director for
16  Operations and Security sent a cease-and-desist letter to Uber CEO Kalanick in which he informed
17  Kalanick that Uber's drivers who did not have permission to operate at San Francisco International
18  Airport ("SFO") were committing trespass.

19      67.   Uber did not comply with the cease-and-desist letter.  Instead, on August 19, 2013,
20  Uber posted a misleading "SFO Update" on its blog in which it told its customers that, "you can
21  request whatever type of car you'd like when your flight lands at SFO – UberX, Uber Black, or
22  Uber SUV."  It also told its customers that, even though SFO had begun issuing citations to Uber
23  drivers who lacked permission to drop off passengers at the airport, "We believe that all rides to
24  and from SFO are legal and that airport officials are acting without proper authority in issuing
25  these citations."  Uber posted the misleading "SFO Update" despite the fact that, eight months
26  before, CEO Kalanick had signed the term sheet with the CPUC in which he agreed that Uber
27  drivers would not conduct unauthorized trips to airports.

# SFO UPDATE

AUGUST 19, 2013
POSTED BY TESS

Some of our San Francisco riders have asked about recent issues they've had or heard about when taking Uber to the airport so we've compiled a few tips to help make sure your trip starts off on the right foot.

*Pickups at the airport:*

You can request whatever type of car you'd like when your flight lands at SFO — uberX, UberBLACK, or UberSUV. Any driver that accepts your ride request can take you home from SFO. For a quick and seamless pickup, call the driver and provide information about the terminal and door number where you're waiting.

*Drop-offs at the airport:*

SFO has taken an aggressive stance against uberX and has begun citing some drivers. We believe that all Uber rides to and from SFO are legal and that airport officials are acting without the proper authority in issuing these citations, but we want to make sure you're aware of the current situation.

68.   Uber's willful violations continued throughout 2014, and Uber's August 19, 2013 "SFO Update" remained on Uber's blog throughout 2013 and 2014.  Uber's "SFO Update" remained on Uber's blog even after the CPUC issued Decision 13-09-045 mandating that "TNCs shall not conduct any operations on the property of or into any airport unless such operations are authorized by the airport authority involved."  And Uber's "SFO Update" remained on Uber's blog even after Uber obtained the Uber CPUC Permit on April, 7, 2014, which explicitly states that the company continues to be subject to Decision 13-09-045's restriction against airport operations: "This permit does not authorize the Carrier to conduct operations on the property of or into any airport unless such operation is authorized by the airport authority involved."

69.   Moreover, when confronted with demands by airport authorities and the CPUC to cease the unlawful activities at airports, Uber's response was an intransigent refusal.   On or about April 2, 2013, San Francisco International Airport's Deputy Director for Operations and Security sent Uber a cease-and-desist letter.  Uber did not comply.  A year later, on or about June 10, 2014, the CPUC's President sent Uber CEO Kalanick a letter demanding that Uber stop its unauthorized operations at airports in California.  The letter informed Kalanick that seven members of the PUC's staff had met with law enforcement personnel from Los Angeles International, Oakland

1   International, San Diego International, San Jose International, and San Francisco International

2   airports who described numerous contacts with Uber drivers who did not have permission to

3   operate at the airports.

4        70.   The CPUC President's letter reminded Kalanick that, "none of your firms have

5   obtained a permit from the airports to transport passengers to and from airport facilities.  Decision

6   13-09-045 specifically requires TNCs to obtain such permits."  It concluded with an order to

7   comply:  "Within two weeks of this letter I expect full compliance with each of the measures

8   adopted in D.13-09-045."  Nevertheless, Uber continued, in violation of Decision 13-09-045, the

9   terms of the Uber CPUC Permit, and state law, to encourage its drivers who lacked permission to

10  operate at SFO to do so during the entire period it was negotiating the license agreement that SFO

11  announced in a press release on October 20, 2014.

12       71.   Moreover, at SFO, Uber gave its drivers a financial incentive to break the law.  Until

13  approximately October 20, 2014, Uber charged UberX customers who traveled to SFO an

14  additional $4.00 on top of the fare and passed the $4.00 on to the driver.  Uber labeled the charge

15  on the customers' receipts an "SFO Airport Fee Toll $4.00."  Uber's website support page

16  described and continues to describe the "Airport Fee Toll" as "a nominal fee to compensate drivers

17  for any airport fees they are charged as part of your trip."  However, Uber's drivers who were not

18  authorized to operate commercially at SFO did not pay anything to the airport.  Uber encouraged

19  these unauthorized drivers to trespass at SFO by paying them $4.00 in addition to their portion of

20  the fare.  The incentive to uberPOOL drivers who were not authorized to operate at SFO was twice

21  as much, given that Uber charged each customer a separate "Airport Fee Toll" for a total of $8.00.

22       72.   Uber fails to comply with Decision 13-09-045 each time one of its drivers picks up or

23  drops off a passenger at a California airport where Uber does not have authorization to operate.

24  Each failure to comply with the terms of Decision 13-09-045 and with the Uber CPUC Permit is a

25  violation of state law pursuant to California Public Utilities Code section 5411.  Each unauthorized

26  trip to a California airport by an Uber driver also constitutes a trespass and a violation of Business

27  and Professions Code section 17200.

73. Uber's violations are numerous. Within the past four years, Uber's drivers made at least 100,000 unauthorized trips to California airports.

### UNTRUE, MISLEADING AND FRAUDULENT AIRPORT FEE TOLL

74. As described in Paragraph 71, Uber had a practice that lasted at least until October 20, 2014, of charging its passengers travelling to SFO a $4.00 "Airport Fee Toll" and telling its customers that the charge was to compensate drivers for airport fees.

## What Is This Charge For A Toll?

If your driver pays a toll during your trip—or if your drop-off location is outside the city limits and a toll is required to return to the city—then the price of the toll will be added to your fare.

In these situations, Uber returns 100% of the toll fee to drivers to ensure that they're fully reimbursed for the additional cost.

You might also notice an **Airport Fee Toll** on your receipt. In select cities, there may be a nominal fee to compensate drivers for any airport fees they are charged as part of your trip. If you think you might have been charged this fee incorrectly, please let us know. You can contact your local community manager at t.uber.com/support

75. When two unrelated customers travel in the same car to SFO using the uberPOOL service, Uber charges the $4.00 "Airport Fee Toll" twice, once to each customer.

76. However, as described in Paragraph 71 above, Uber charged this "Airport Fee Toll" even though it knew its drivers who were not authorized to operate commercially at SFO paid nothing to the airport. Uber's representation to its customers that the $4.00 is an "Airport Fee Toll," and explanation that "[i]n select cities, there may be a nominal fee to compensate drivers for any airport fees they are charged as part of your trip" was likely to mislead its customers who were riding with these unauthorized drivers to believe that the driver had pay $4.00 to the airport for the trip, and that the $4.00 would serve to reimburse the driver.

77. Moreover, Uber's representation to its customers that "[i]n select cities, there may be a nominal fee to compensate drivers for any airport fees they are charged as part of your trip" was also likely to mislead its customers who travel to SFO in a car driven by a driver who had

1   permission to operate commercially at SFO.  These drivers paid the airport a trip fee that in 2013

2   and 2014 varied over time but was $3.85 at its maximum.  Uber's representation was likely to

3   mislead customers of these authorized drivers into believing that the entire $4.00 would actually be

4   paid to SFO.

5   UBER'S CORPORATE POLICY OF "REGULATORY DISRUPTION"

6   78.  California Business and Professions Code section 17206 requires the Court to

7   consider the persistence, length of time, and willfulness of Uber's misconduct in assessing the

8   amount of civil penalties.

9   79.  Uber launched its business in California without obtaining approval of the Uber App

10   technology as required by Business and Professions Code section 12500.5, and then over a period

11   of at least four years has repeatedly ignored and continues to ignore demands to come into

12   compliance.  Uber also began operating at California airports without first obtaining the requisite

13   permits, and has encouraged its drivers to swarm the airports even after receiving multiple cease-

14   and-desist orders from the applicable airport authorities and from the California Public Utilities

15   Commission.

16   80.  Uber has been acting pursuant to its well-known corporate policy of setting up shop

17   first and dealing with the regulators later.  This policy, which CEO Kalanick proudly dubs

18   "Regulatory Disruption," consists of ignoring laws and regulations that get in the way of the

19   company's rapid expansion into the market, and then aggressively fighting any regulatory

20   enforcement efforts which may follow.  One reporter who recently interviewed Kalanick for a

21   lengthy profile story remarked, "All told, it's not just that Uber has adopted the business school

22   maxim 'Don't ask for permission; ask for forgiveness'—it has instituted a policy of asking for

23   neither."

24   81.  Uber's unabashed refusal to comply with California regulators and California law is

25   consistent with its "Regulatory Disruption" policy, is willful and persistent within the meaning of

26   Business and Professions Code section 17206, and has been ongoing for years.

27   //

### FIRST CAUSE OF ACTION
Business & Professions Code § 17500, *et seq.*
(Untrue or Misleading Statements)

82. Plaintiff, the People of the State of California, restates and incorporates paragraphs 1 through 81 as though fully set forth herein.

83. Beginning at an exact date unknown to Plaintiff, but in any event within three years of the filing of this complaint, and continuing to the present, defendants, with the intent to perform services, or to induce members of the public to enter into obligations relating thereto, made or disseminated or caused to be made or disseminated before the public in the State of California statements concerning such services, or matters of fact connected with the performance thereof, which were untrue or misleading, and which defendants knew or reasonably should have known were untrue or misleading, in violation of Business and Professions Code section 17500 *et seq.* Such statements include but are not limited to all of the representations set forth and discussed in paragraphs 13 through 43, 67, 71, and 74 through 77, above.

### SECOND CAUSE OF ACTION
Business & Professions Code § 17200, *et seq.*
(Unfair Competition and Unlawful Business Practices)

84. Plaintiff, the People of the State of California, restates and incorporates paragraphs 1 through 83 as though fully set forth herein.

85. Beginning at an exact date unknown to Plaintiff, but in any event within four years of the filing of this complaint, and continuing to the present, defendants engaged and continue to engage in acts of unfair competition and in unfair, deceptive or unlawful business practices within the meaning of Business and Professions Code section 17200, *et seq.*, including but not limited to the following:

A. Defendants made untrue or misleading statements in violation of Business and Professions Code section 17500, as set forth and discussed in paragraphs 13 through 43, 67, 71, and 74 through 77, above, and in the First Cause of Action.

//

B. Defendants undertook the following unfair methods of competition or unfair or deceptive acts or practices in transactions intended to result or which did result in the sale of services to consumers, in violation of Civil Code section 1770(a):

(1) Defendants, by use of the untrue or misleading statements set forth and discussed in paragraphs 13 through 43, above, represented that services have characteristics or benefits which they do not have, in violation of Civil Code section 1770(a)(5);

(2) Defendants, by use of the untrue or misleading statements set forth and discussed in paragraphs 13 through 43, and 67, above, represented that services are of a particular standard or quality when they are of another, in violation of Civil Code section 1770(a)(7); and

(3) Defendants, by use of the untrue or misleading statements set forth and discussed in paragraphs 13 through 43, above, disparaged the services or business of another by false or misleading representation of fact, in violation of Civil Code section 1770(a)(8).

C. Defendants used the Uber App technology for commercial purposes to measure time and distance in calculating fares for its customers without first having obtained approval from the California Department of Food and Agriculture, in violation of Business and Professions Code section 12500.5.

D. Defendants violated California Public Utilities Code section 5411 by disobeying CPUC Decision 13-09-045, the terms of the Uber CPUC Permit, and CPUC demands.

E. Defendants committed trespass in violation of Penal Code section 602 by encouraging, aiding and abetting, within the meaning of Penal Code section 32, Uber drivers to pick up and drop off passengers at California airports without permission of the airport authorities.

F. Defendants committed fraud within the meaning of Civil Code section 1572 by adding a $4.00 "Airport Fee Toll" charge on customer receipts for trips to and from San Francisco International Airport to compensate drivers for airport fees the drivers never pay.

G. Defendants committed fraud within the meaning of Civil Code section 1572 by adding a $4.00 "Airport Fee Toll" charge on customer receipts for trips to and from San Francisco

1 | International Airport when the amount actually paid to the airport was less than $4.00.

2 |       H.   Defendants committed fraud within the meaning of Civil Code section 1572 by

3 | charging customers who used the UberX service a $1.00 "Safe Rides Fee" purportedly to cover the

4 | cost of background checks that Uber falsely advertised as "industry-leading."

**PRAYER FOR RELIEF**

6 | **WHEREFORE**, Plaintiff prays for judgment as follows:

7 |     1.   That pursuant to Business and Professions Code sections 17203 and 17535, and

8 | the Court's inherent equity powers, defendants their subsidiaries; their successors and the

9 | assigns of all or substantially all the assets of their businesses; their directors, officers,

10 | employees, agents, independent contractors, partners, associates and representatives of each of

11 | them; and all persons, corporations and other entities acting in concert or in participation with

12 | defendants, be permanently restrained and enjoined from:

13 |       A.   Making, disseminating, or causing to be made or disseminated, any

14 | misleading, untrue or deceptive statements in violation of section 17500 of the Business and

15 | Professions Code, including, but not limited to, the untrue or misleading statements alleged in

16 | the First Cause of Action of this complaint; and

17 |       B.   Engaging in any acts of unfair competition, in violation of section 17200 of

18 | the Business and Professions Code, including but not limited to the unlawful business acts and

19 | practices alleged in the Second Cause of Action of this complaint.

20 |     2.   That pursuant to Business and Professions Code section 17536, defendants and

21 | each of them be ordered to pay a civil penalty of Two Thousand Five Hundred Dollars

22 | ($2,500.00) for each violation of Business and Professions Code section 17500, according to

23 | proof.

24 |     3.   That pursuant to Business and Professions Code section 17206, defendants and

25 | each of them be ordered to pay a civil penalty of Two Thousand Five Hundred Dollars

26 | ($2,500.00) for each violation of Business and Professions Code section 17200, according to

27 | proof.

4.    That pursuant to Business and Professions Code sections 17535 and 17203, and pursuant to the Court's inherent equitable power, defendants be ordered to restore to every person in interest all money and property which was acquired by defendants through their unlawful conduct, according to proof.

5.    That Plaintiff be awarded its costs of suit.

6.    That Plaintiff be given such other and further relief as the nature of this case may require and this Court deems proper to fully and successfully dissipate the effect of the unlawful business practices and untrue or misleading representations contained herein.

DATED: December _7_ 2014

GEORGE GASCÓN
District Attorney, City and County of San Francisco

BY: _____
JUNE D. CRAVETT
Assistant Chief District Attorney

DATED: December 9, 2014

JACKIE LACEY
District Attorney, County of Los Angeles

BY: _____
STANLEY P. WILLIAMS
Head Deputy District Attorney